STATE OF NORTH CAROLINA v. WILLIAM RICHARD BRAY

No. 501A86

(Filed 9 March 1988)

1. **Weapons and Firearms § 3— discharging gun into occupied property—gun inside vehicle when fired**

     Defendant discharged a gun "into" an occupied vehicle within the meaning of N.C.G.S. § 14-34.1 where he was standing outside the vehicle when he fired shots from a pistol even though the pistol itself was inside the vehicle when the shots were fired.

2. **Homicide § 21.5— first degree murder—sufficient evidence of premeditation and deliberation**

     There was sufficient evidence of premeditation and deliberation to support defendant's conviction of first degree murder of a highway patrolman where the evidence tended to show: when the patrolman stopped the truck in which defendant was riding, the driver threw a .25 caliber pistol to defendant; before defendant got out of the truck to go over to the patrol car, he put the pistol in his jacket pocket; when defendant was standing outside the passenger window of the patrol car, he heard "armed and dangerous" and then "armed" over the patrolman's radio; and after the driver of the truck yelled for him to shoot the patrolman, defendant reached into his pocket, pulled out the pistol, and shot through the window of the patrol car into the patrolman's head.

3. **Criminal Law § 9.3; Robbery § 4.6— armed robbery—acting in concert theory**

     The State's evidence was sufficient to support defendant's conviction for armed robbery of a highway patrolman's revolver under a theory of acting in concert where it tended to show that defendant and his companion escaped together from an Arkansas jail; they broke into an Arkansas home and stole a rifle and a truck; they were carrying a .25 caliber pistol when the patrolman stopped their truck; defendant shot the patrolman with the .25 caliber pistol, the companion shot the patrolman with his own revolver, and the companion took the patrolman's revolver when he and defendant fled the scene; and two days later defendant and his companion broke into another home and stole another gun. Evidence that defendant ran back to the truck after shooting the patrolman and before his companion took the patrolman's revolver does not establish that defendant and his companion were not acting in concert in the armed robbery.

4. **Burglary and Unlawful Breakings § 1.2— second degree burglary—acting in concert—constructive breaking**

     The State's evidence was sufficient for the jury on the issue of defendant's guilt of second degree burglary under a constructive breaking theory where it tended to show that defendant and a companion had escaped together from an Arkansas jail and were acting in concert to evade the authorities; the companion gained entrance to a house by breaking a stick which held a window down, raising the window, and tearing a hole in the

State v. Bray

plastic covering inside the window; while the companion broke into the house, defendant hid in a tobacco barn; and defendant later went into the house with the companion where they stole food, blankets and a gun.

**5. Criminal Law § 33.4— evidence to gain sympathy—admission as harmless error**

In a prosecution for first degree murder of a highway patrolman, assuming, *arguendo*, that the court erred in allowing the patrolman's parents and fiancee to raise their hands and identify themselves in the courtroom and in allowing the patrolman's mother to testify when she last saw her son alive, where her son was buried, and whether her son was engaged, the error was harmless in light of defendant's admission that he shot the patrolman under the circumstances related in his statement. N.C.G.S. § 15A-1443(a).

**6. Criminal Law § 34.7— prior crimes—admissibility to show motive**

In a prosecution for the first degree murder of a highway patrolman, evidence that defendant and a companion assaulted a jailer with a pipe to escape from jail in Arkansas and that they broke into an Arkansas home and stole a rifle and a truck which they drove to North Carolina was admissible under N.C.G.S. § 8C-1, Rule 404(b) to show intent and motive for killing the patrolman.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) (1986) from a judgment imposing a sentence of life imprisonment entered by *Stephens, J.,* upon defendant's conviction of first degree murder at the 5 May 1986 Special Criminal Session of Superior Court, MADISON County. On 19 May 1987 we allowed defendant's petition to bypass the Court of Appeals in appeals from convictions of robbery with a firearm, discharging a firearm into occupied property, second degree burglary, and larceny of a firearm. Heard in the Supreme Court 8 December 1987.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda Anne Morris, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of the first degree murder of Bobby Lee Coggins, for which he received a life sentence. He was also convicted of armed robbery, for which he received a forty-year sentence (consecutive), discharging a firearm into occupied property, for which he received a ten-year sentence (consecutive), sec-

ond degree burglary, for which he received a forty-year sentence (consecutive), and larceny of a firearm, for which he received a three-year sentence (consecutive). We find no error.

The State's evidence, in pertinent summary, showed the following:

On 26 August 1985, defendant and Jimmy Dean Rios escaped from the Franklin County Jail in Ozark, Arkansas, by attacking the jailer, hitting him on the head with a metal pipe, and locking him in a cell. On 29 August, William Harriman, who lived seventeen miles from the jail, reported that his 1976 orange and white truck had been stolen. A window in his trailer had been broken; the truck keys and a .22 caliber rifle were missing from the trailer.

David Lavender, a South Carolina resident, testified that while he was in Tennessee in early September 1985, he noticed that the license plate (South Carolina "ULS 161") on his van was missing.

Jerry Richman testified that defendant and Rios lived with him in Asheville between 5 and 14 September 1985, and that they had a Chevrolet pickup truck with South Carolina license plate ULS 161. They left on the morning of 14 September.

Karen Haggar testified that she met defendant and Rios at a bar in Asheville in September 1985. Rios was driving a pickup truck and had an automatic handgun. Defendant and Rios drove to her house at noon on 14 September.

On 14 September 1985, Bobby Lee Coggins, a member of the North Carolina State Highway Patrol, was on duty in Madison County. Frank Huggins and Joe Rathbone were working at the Asheville Division Highway Patrol communications headquarters at that time. Coggins called headquarters around 4:25 p.m. and asked for a driver's license information check and a vehicle identification check on an orange and white pickup truck with a South Carolina tag. After running computer checks, Rathbone informed Coggins that the tag was registered to a van owned by a resident of South Carolina, that the truck had been stolen in Arkansas by escaped prisoners, and that the prisoners were considered armed. Coggins stated that everything was "10-4" or okay. When Rathbone and Huggins attempted to contact Coggins at 4:43 p.m., they could not get an answer.

Johnny Norton, Joey Moore, and Howard Holder testified that they were driving on Highway 209 sometime after 4:00 p.m. when they saw Coggins' patrol car pulled over at the Vann Cliff Overlook behind an orange and cream-colored truck. Coggins was at the truck with defendant and another man.

Billy Cantrell testified that he had stopped at the overlook at about 4:00 p.m. and had seen a patrol car and a Chevrolet pickup truck there. He drove up the road and after a few minutes drove back by. At that time, he saw that one man was squatting outside the passenger side of the patrol car, while the trooper and Rios were sitting inside the car.

Tom Fuhr and Homer Wilkins testified that they stopped at the overlook at about 4:25 to 4:30 p.m. They saw a pickup truck and a Highway Patrol car there. The trooper was in his car and appeared to be writing. Two other men were there; one was seated in the passenger's seat of the patrol car and the other was bending over outside the truck, looking under the seat, on the floor board, or behind the seat of the pickup truck. Wilkins asked the second man, "What's the cop unhappy about?" The man mumbled about there being something wrong with the driver's license, then leaned into the cab of the truck to look under the seat. Trooper Coggins told Fuhr that he was doing business there and requested that the men leave the area. They got in their car and drove south on Highway 209. After they had been driving for about three or four minutes, the pickup truck passed them, going very fast, and disappeared around a curve.

Around 4:30 to 4:45, Lee Phillips drove past Coggins' patrol car, then returned to the overlook after some of his passengers said that they had seen blood on the patrolman. The engine of the patrol car was running, the blue lights were on, and the doors were closed. The window on the driver's side was rolled all the way down and the window on the passenger's side was rolled about halfway down. Phillips testified that there was blood coming out of Coggins' ear, and that he had a clipboard in his hand with some writing on it, including a tag number and the word "Arkansas." Coggins' gun holster was unsnapped and his gun was missing. Phillips called the Asheville Highway Patrol on the patrol car's radio and told them that "a cop had been shot" outside Hot Springs. Another man who had stopped at the scene gave the

location to the people in Asheville and told them that Coggins was dead.

At about 6:30 p.m., the Madison County sheriff discovered the pickup truck, with South Carolina tag ULS 161, stuck in a bank 13.5 miles from Vann Cliff Overlook.

On 16 September 1985, around dusk, Rachel Gillespie, a 76 year-old woman who lived alone on a farm off Highway 209, left home to spend the night with a relative. She locked the doors; the windows were closed. When she returned to her house around 7:30 the next morning, she found that her .25-20 rifle was missing, as well as a quilt, a blanket, some clothes, a suitcase, a flashlight, and some food. A stick that had held a window down was broken, and a hole had been torn through plastic on the inside of the window.

At about 3:00 p.m. on 17 September, defendant and Rios were arrested. Before they were captured, Rios dropped Coggins' .357 Magnum revolver and kicked it away. When searched, defendant was found to have a .25 caliber automatic pistol.

State Medical Examiner Page Hudson testified that he performed an autopsy on Trooper Coggins. He found that Coggins had three gunshot wounds on the right side of his head: one on the forehead, one near the ear, and one near the mouth. Dr. Hudson testified that a .25 caliber bullet caused the wound on the forehead; it entered the head at a downward angle, grazed the brain, then lodged in bone under the brain. Although this wound was very serious, it was "probably not fatal." The wound near the ear was caused by the bullet of a .357 Magnum revolver. The bullet had gone through much of the brain, slightly back and upward, then lodged in the skull. In Dr. Hudson's opinion, this was the most severe wound; it would have been immediately fatal. The wound near the mouth was caused by a .25 caliber bullet which went into the floor of the mouth, forward and somewhat downward. In Dr. Hudson's opinion, that wound would not have been fatal. Dr. Hudson also testified that in his opinion the wounds were "generally contemporaneous." He also testified that the muzzles of the guns were "within approximately a couple of feet from the face of Mr. Coggins" when they were fired. However, the mouth wound was probably caused by a shot from a greater distance, by a foot or so, than the forehead wound.

Fingerprints were taken from the patrol car and from the pickup truck. Rios' fingerprints were found on the front bumper of the truck and on the outside of the patrol car at the handle of the front passenger door. Defendant's fingerprints were found around the truck and on the exterior of the front passenger door of the patrol car.

At trial, an SBI agent testified that the .25 caliber pistol found on defendant fired the two .25 caliber bullets that hit Trooper Coggins and the two .25 caliber spent shells found in the patrol car. The agent also testified that the bullet that caused Coggins' ear wound had been fired from Coggins' .357 Magnum revolver, the gun that Rios had dropped before he was arrested.

Defendant's statement to police, made on 17 September 1985, was read into evidence at trial. In that statement, defendant said that he and Rios had arrived in Asheville in "the first part of September." They met Jerry Richman and told him that their money had been stolen. He let them stay at his apartment until the morning of the murder. On 13 September 1985, Rios borrowed a .25 caliber automatic pistol from Richman's roommate's girl-friend. On 14 September, Rios wanted to ride to Hot Springs to take some pictures. He and defendant left at about 2:30 p.m. The statement continued:

Then we started up to Hot Springs and had some beer with us. On toward Hot Springs the trooper got behind us and followed us for about four or five miles. When he stopped us Jimmy threw me the automatic and said, "Here[,] I think I'm going to get searched." I shoved it under my seat. The Trooper came up to the door and asked Jimmy to come back to his car. I got out and just stood there smoking cigarettes while the Trooper had Jimmy walk a line and all that stuff to see if he was drunk. He then made Jimmy pour our beer out over the rail. The Trooper then asked Jimmy to get into his car, which he did. And I got back into the truck. The Trooper then walked up to the driver's side of the truck and looked under the seat. He then walked around . . . to come to my side and I put the gun in my right Levi jacket pocket.

At that point Jimmy asked me to come back to the Patrol car and I did. The Trooper then came back to his car and started talking on his radio. I then heard on the radio a

code 10-30 something on the radio. The radio then said something about armed and dangerous and then just armed. Jimmy started yelling shoot him, shoot him, and I saw the Trooper reach for his gun through the passenger side door where I was standing. The Trooper then turned to face Jimmy and I stuck the gun in the window in front of Jimmy's face. I fired once, I remember, and it being an automatic I might have fired twice. I'm sure I hit him but he picked up his radio and was saying something like you can't do this. He was capable of talking and I felt sick at what I had done. I felt like the trooper would be all right if Jimmy hadn't shot him with his gun.

When I shot him I ran toward the front of the truck and Jimmy got out. I saw Jimmy kinda squat down and shoot him. We got into the truck and I told Jimmy he should not have done that. He said that he was calling for help and I told him that didn't matter he shouldn't have done it. Right when the trooper was stopping us Jimmy said, "I don't want to shoot him." And I said, "I don't either." I don't know why Jimmy told me to shoot him or why I did.

The Trooper had told Jimmy that he would have to go with him to Hot Springs, but he told me I did not have to. After we shot him we rode around some and Jimmy said he had shot the trooper in the ear and kinda grinned about it. After a while he turned left off the road and got the truck stuck. We then got out and started to run. I had the automatic and Jimmy had the Trooper's gun. As we started to cross the road a woman almost hit Jimmy and he dropped the gun. He picked it up and we ran.

On Monday night we came up on a house and Jimmy said he had to get some food so he went into a window of a house. He said he broke some stick and lifted a window. I was still hiding in a tobacco barn when he did that. About two or three hours later Jimmy brought me some eggs and coffee. He then told me to come with him and we fixed some more eggs. We also took two blankets and some canned food. We laid down on a hill and went to sleep and the next thing I knew Jimmy woke me up and said here comes the law, and we ran.

Before we left the house, Jimmy loaded a rifle and I carried it out of the house. Later on while we were running I put the gun under a log and we kept running. We just kept running until they caught us.

At trial, the State relied in part on a premeditation and deliberation theory of first degree murder, and in part on a felony murder theory, with the offense of discharging a firearm into occupied property as the underlying felony. The court instructed the jury on both theories, and the jury found defendant guilty of first degree murder on the basis of both theories.

[1] Defendant first contends that his convictions for discharging a firearm into occupied property and for first degree murder based on the felony murder rule must be vacated because there is insufficient evidence that he discharged a firearm "into" Trooper Coggins' patrol car. Defendant argues that the evidence shows that the .25 caliber pistol was inside the patrol car when he fired, and that a firearm which is inside a vehicle when fired is not discharged *into* the vehicle. *See* N.C.G.S. § 14-34.1 (1986) ("[a]ny person who willfully or wantonly discharges . . . [a] firearm into any . . . vehicle . . . while it is occupied is guilty of a Class H felony.").

We recently resolved this issue against defendant's position. "[A] firearm can be discharged 'into' occupied property even if the firearm itself is inside the property, so long as the person discharging it is not inside the property." *State v. Mancuso*, 321 N.C. 464, 468, 364 S.E. 2d 359, 362 (1988). Here, the evidence shows that when defendant fired the shots from the pistol, he was standing outside the patrol car. Therefore, defendant discharged the gun "into" the car within the meaning and intent of "into" as used in N.C.G.S. § 14-34.1.

The trial court also properly refused to instruct the jury, as defendant requested, that "the felony of firing into [an] occupied automobile is not satisfied by a shot that's fired from within the automobile," because such an instruction would clearly be an incorrect statement of the law. *See id.; State v. Corn*, 307 N.C. 79, 86, 296 S.E. 2d 261, 266 (1982) (trial judge only required to give requested instruction "if it is a correct statement of the law and supported by the evidence").

[2] Defendant also contends that his conviction for first degree murder based on premeditation and deliberation must be vacated because there is insufficient evidence that he acted with premeditation and deliberation. To convict of first degree murder, the State must prove beyond a reasonable doubt that the defendant formed a specific intent to kill after premeditation and deliberation. *State v. Propst*, 274 N.C. 62, 70, 161 S.E. 2d 560, 566 (1968). Premeditation means that the defendant thought about killing the victim for some period of time, however short, before the killing. *State v. Fields*, 315 N.C. 191, 200, 337 S.E. 2d 518, 524 (1985). Deliberation means the execution of an intent to kill in a cool state of blood without legal provocation and in furtherance of a fixed design; it does not require reflection for any appreciable length of time. *State v. Britt*, 285 N.C. 256, 262, 204 S.E. 2d 817, 822 (1974). Among the circumstances to be considered to determine whether a defendant acted after premeditation and deliberation are the want of provocation by the victim, the defendant's conduct before and after the killing, and the nature and number of wounds. *State v. Myers*, 309 N.C. 78, 84, 305 S.E. 2d 506, 510 (1983).

Here, the evidence shows that when Trooper Coggins stopped the truck, Rios threw the .25 caliber pistol to defendant. Before defendant got out of the truck to go over to the patrol car, he put the pistol in his jacket pocket. When defendant was standing outside the passenger window of the patrol car, he heard "armed and dangerous," then "armed," over Coggins' radio. Defendant claims that after Rios yelled for him to shoot Coggins, he reached into his pocket, pulled out the pistol, and shot through the window of the patrol car into Coggins' head. This evidence is clearly sufficient to show that defendant acted with premeditation and deliberation when he shot Coggins.

[3] Defendant next contends that his conviction for the armed robbery of Coggins' revolver should be vacated because there is insufficient evidence that he acted in concert with Rios in the armed robbery. The State relied on the acting in concert theory to establish defendant's guilt because there was no evidence that defendant himself actually committed the taking and carrying away element of the offense. The trial court instructed the jury that in determining whether defendant committed the crime of armed robbery, it could consider whether defendant was acting in

concert with Rios. This Court has held that to be convicted under an acting in concert theory, a defendant must have been at the scene of the crime and the evidence must be "sufficient to show he [was] acting together with another who [did] the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime." *State v. Joyner*, 297 N.C. 349, 357, 255 S.E. 2d 390, 395 (1979).

Defendant's argument that he could not have been acting in concert to commit armed robbery because he personally did not have any intention of stealing Coggins' revolver, and because he had gone back to the truck by the time Rios took the gun, is without merit. The evidence shows the following:

After escaping from the Arkansas jail, defendant and Rios broke into Harriman's trailer and stole a .22 caliber rifle. On the morning of 14 September 1985, they were carrying a .25 caliber pistol. After shooting Trooper Coggins, Rios took Coggins' .357 Magnum revolver, and he and defendant fled the scene. Two days later, they broke into Gillespie's house and stole her .25-20 rifle. This is sufficient evidence to allow a jury to find that Rios and defendant were acting together pursuant to a common plan to obtain weapons and to do whatever else was necessary to avoid capture by the authorities, and that their armed robbery from, and murder of, Trooper Coggins was part of this plan.

Evidence that defendant ran back to the truck after shooting Coggins and before Rios took Coggins' revolver does not establish that defendant and Rios were not acting in concert. In *State v. Handsome*, 300 N.C. 313, 266 S.E. 2d 670 (1980), we upheld a conviction for armed robbery on an acting in concert theory where the victim was shot, then robbed. There, the defendant contended that the evidence was insufficient to convict him of armed robbery. He argued that although he may have participated in the assault on the victim, there was no evidence that he intended to steal the property or had possession of the property. We held that the evidence was sufficient because "[t]he elements of violence and taking were so joined in time and circumstances in one continuous transaction amounting to armed robbery as to be inseparable." *Id.* at 318, 266 S.E. 2d at 674. Here, the use of arms against Coggins and the actual taking away of his revolver were equally part of the same "continuous transaction amounting to armed robbery."

[4] Defendant assigns error to the trial court's denial of his motion to dismiss the burglary charge at the close of all the evidence, contending that there was insufficient evidence that he committed a breaking. When ruling on a defendant's motion to dismiss, the question for the court is whether there is substantial evidence of each element of the charged offense and that defendant was the perpetrator. *State v. Alston*, 310 N.C. 399, 404, 312 S.E. 2d 470, 473 (1984). The evidence must be considered in the light most favorable to the State. *Id.*

Second degree burglary is the breaking and entering during the nighttime of an unoccupied dwelling with the intent to commit a felony therein. N.C.G.S. § 14-51 (1986); *State v. Wilson*, 289 N.C. 531, 538, 223 S.E. 2d 311, 315 (1976). A "breaking" is "any act of force, however slight, 'employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed.'" *State v. Noland*, 312 N.C. 1, 13, 320 S.E. 2d 642, 650 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L.Ed. 2d 342 (1985) (quoting *State v. Jolly*, 297 N.C. 121, 127-28, 254 S.E. 2d 1, 5-6 (1979)). A breaking may be actual or constructive. *State v. Wilson*, 289 N.C. at 539, 223 S.E. 2d at 316. A defendant has made a constructive breaking when another person who is under the defendant's direction or who is acting in concert with the defendant actually makes the opening. *State v. Smith*, 311 N.C. 145, 149-50, 316 S.E. 2d 75, 78 (1984).

There is substantial evidence that Rios broke into the Gillespie house. He gained entrance by breaking a stick which held a window down, raising the window, and tearing a hole in the plastic covering inside the window. There is also substantial evidence that Rios and defendant were acting in concert to evade the authorities. While Rios broke into the house, defendant hid in a tobacco barn. Later, defendant went into the house with Rios and they stole some food, blankets and a gun. This evidence clearly permitted a finding that defendant and Rios were acting in concert to further their joint effort to evade the authorities when Rios committed the breaking on the Gillespie house. Therefore, under a constructive breaking theory, there is substantial evidence that defendant broke into the Gillespie house, sufficient to withstand defendant's motion to dismiss.*

---

* Defendant attempts to argue under this assignment of error certain errors in the trial court's charge to the jury. However, the assignment relates only to the

**[5]**  Defendant contends that he is entitled to a new trial because the court admitted irrelevant, prejudicial evidence concerning Trooper Coggins' parents and fiancee. First, the court allowed Coggins' parents and fiancee to raise their hands to identify themselves in the courtroom. Second, the court allowed the District Attorney to call Coggins' mother as a witness and to ask her questions such as when she last saw her son alive, where her son was buried, and whether her son was engaged to Joe Justice's daughter. Defendant claims that this evidence is inadmissible under the Rules of Evidence because it is irrelevant and was offered only to create sympathy for Coggins and to inflame the jury. Assuming, *arguendo*, that the court erred in admitting this evidence, we hold that the error was harmless in light of defendant's admission that he shot Coggins under the circumstances related in his statement. N.C.G.S. § 15A-1443(a) (1983).

---

trial court's refusal to dismiss the charge of second degree burglary. Rule 28(b)(5) of the Rules of Appellate Procedure states in part:

> (b) Content of Appellant's Brief. An appellant's brief in any appeal shall contain . . .:
>
>> (5) An argument to contain the contentions of the appellant with respect to each question presented. Each question shall be separately stated. Immediately following each question shall be a reference to the assignments of error and exceptions by the pages at which they appear in the printed record on appeal, or the transcript of proceedings if one is filed pursuant to Rule 9(c)(2). Exceptions not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned.

N.C.R. App. P. 28(b)(5). Because defendant has not assigned error to or set forth in his brief any question concerning the court's charge to the jury on the burglary offense, and because defendant cannot argue errors in the charge under an assignment of error solely as to a motion to dismiss, the sole question before this Court is whether the trial court improperly denied defendant's motion to dismiss.

Further, defendant did not object at trial to the instructions on this offense, and did not request additional instructions thereon. We thus could find reversible error in the instructions only if "absent the error the jury probably would have reached a different verdict." *State v. Walker*, 316 N.C. 33, 39, 340 S.E. 2d 80, 83-84 (1986); *see also State v. Odom*, 307 N.C. 655, 661, 300 S.E. 2d 375, 378-79 (1983). In light of the substantial evidence that defendant and Rios in fact acted in concert in the commission of the burglary, and of the trial court's clear and repeated instructions on acting in concert with reference to the other offenses, we do not believe that absent any error in the instructions on the burglary offense, the jury probably would have reached a different result.

[6]  Finally, defendant contends that he is entitled to a new trial because the trial court admitted inadmissible and prejudicial "other crimes" evidence. First, the court allowed Chris Vigil, the jailer from Ozark, Arkansas, to testify that defendant escaped from jail and to describe how defendant assaulted him with a pipe. Second, the court allowed William Harriman to testify that his truck and a .22 rifle were stolen on 28 or 29 August 1985. Defendant argues that this "other crimes" evidence is inadmissible under N.C.G.S. § 8C-1, Rule 404(b) as tending to show that defendant had a propensity to commit assaults and robberies.

While Rule 404(b) prohibits "[e]vidence of other crimes, wrongs or acts . . . to prove the character of a person in order to show that he acted in conformity therewith," it allows the admission of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment, or accident." N.C.G.S. § 8C-1, Rule 404(b) (1986). The testimony of Vigil and Harriman was admissible to show intent and motive. Their testimony shows that defendant and Rios intended to escape from jail, then do whatever was necessary to avoid capture, and therefore that they had a motive for killing Trooper Coggins. The chain of events from the time of their escape demonstrates their attempt to avoid apprehension: they assaulted the jailer with a pipe to escape from jail; they broke into an Arkansas home and stole a rifle and a truck; they drove to North Carolina; they stole a South Carolina license plate for the truck; they borrowed a pistol; they shot a state trooper, stole his revolver, then fled the scene; they broke into another home, where they stole another gun. We therefore hold that Vigil's and Harriman's testimony was admissible under Rule 404(b). Moreover, because we find that the probative value of this testimony outweighs any possible unfair prejudice to defendant, we hold that the court properly admitted it into evidence. N.C.G.S. § 8C-1, Rule 403 (1986).

For the reasons above, we find that the defendant received a fair trial, free from prejudicial error.

No error.