STATE OF NORTH CAROLINA v. EARNEST BEARTHES

No. 494A89

(Filed 12 June 1991)

1. **Constitutional Law § 242 (NCI4th)— murder—psychiatrist's report revealed to prosecutor—motion for new psychiatrist**

   The trial court did not err in a murder prosecution by denying defendant's motion to appoint a new independent psychiatrist. The requirements of *Ake v. Oklahoma*, 470 U.S. 68, were satisfied when defendant had access to an examination by a psychiatrist to determine whether defendant's state of mind at the time of the commission of the offense would support a defense and then to assist in evaluating, preparing and presenting that defense at trial. The fact that the district attorney received a copy of the report did not deny defendant his right of access to a competent psychiatrist for the purpose of assisting him in preparing his defense; the requirements of *Ake* were satisfied at the time the independent exam was conducted.

   **Am Jur 2d, Criminal Law §§ 116, 719.**

   **Right of indigent defendant in state criminal case to assistance of psychiatrist or psychologist. 85 ALR4th 19.**

2. **Criminal Law § 113 (NCI4th)— murder—discovery—information released two days prior to trial—no error**

   The trial court did not err by denying defendant's motion to continue a murder prosecution because the State released discoverable information only two days prior to trial. Defense counsel only asserted that he required additional time to review and assimilate the material but failed to identify or articulate

STATE v. BEARTHES

[329 N.C. 149 (1991)]

any basis upon which any part of the recently provided discovery material necessitated additional investigation or preparation.

**Am Jur 2d, Depositions and Discovery §§ 422, 427.**

3. **Jury § 7.12 (NCI3d)— murder—jury selection—juror equivocal on death penalty—excused for cause**

The trial court did not err in a murder prosecution by excusing for cause a prospective juror who was equivocal on the death penalty. The response of the juror to questions of the state and the trial court revealed that his views about the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Furthermore, defendant suffered no prejudice because he did not receive the death penalty.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note—Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

4. **Jury § 6 (NCI3d)— murder—jury selection—voir dire examination of one juror by court—no error**

The trial court did not err in a murder prosecution by conducting an entire voir dire examination of a potential juror. The questioning was not improper because the inquiry by the trial court constituted neither an expression of opinion as to the guilt or innocence of the defendant nor a suggestion of alliance with the prosecution.

**Am Jur 2d, Jury §§ 198, 200.**

5. **Criminal Law § 43.4 (NCI3d)— murder—autopsy photos of victim—admissible**

The trial court did not err in a murder prosecution by admitting into evidence twelve autopsy pictures where the victim had been stabbed 34 times. The fact that photographs of a homicide victim are gory, gruesome, horrible, or revolting will not preclude admission so long as the photographs are used for illustrative purposes and are not excessive or repetitious.

**Am Jur 2d, Homicide §§ 417-419.**

Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.

6. **Homicide § 18.1 (NCI3d)— murder—time required for death—admissible**

The trial court did not err in a murder prosecution by allowing the prosecution to repeatedly ask the medical examiner how long it would have taken the victim to die from each of her 23 life-threatening wounds when the medical examiner had already testified that the victim died within 3 to 5 minutes. The nature of wounds to a victim is a circumstance to be considered in determining whether a defendant acted after premeditation and deliberation.

**Am Jur 2d, Homicide § 439.**

7. **Criminal Law § 75.9 (NCI3d); Criminal Law § 86.6 (NCI3d)— murder—defendant's statement—admissible**

The trial court did not err in a murder prosecution by admitting a "clarifying statement" made by defendant after defendant had been informed of his rights and had informed the officer 3 times that "I'd better not say anything else." The trial court conducted a voir dire and concluded, among other things, that the officer did not initiate conversation or interrogation; defendant volunteered statements which were not the result of custodial interrogation and were not in response to any question by the officer; the officer asked defendant two clarifying questions after defendant made his statement; defendant made the statements knowingly and voluntarily; and defendant knowingly waived his right to remain silent. Defendant opened the door to the admission of prior inconsistent statements for the purpose of impeachment when he took the stand and testified that he had no recollection of events.

**Am Jur 2d, Evidence §§ 529, 543, 549.**

8. **Criminal Law § 113 (NCI4th)— murder—discovery—statement by defendant—revealed two days before trial**

The trial court did not err in a murder prosecution by admitting a statement by defendant that "if I don't get my family back soon, something bad is going to happen" when the statement was not disclosed to defendant until two days before trial. The explanation by the district attorney and the voir dire testimony of the state's witness established that the

state was not aware of the statement on the Wednesday prior to the week of trial. Moreover, defendant failed to establish that the trial court abused its discretion in denying his motion to suppress; the sanctions provided in N.C.G.S. § 15A-910 are permissive, not mandatory. N.C.G.S. § 15A-903.

**Am Jur 2d, Depositions and Discovery §§ 421, 422, 427.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Albright, J.*, at the 22 May 1989 Criminal Session of Superior Court, ROWAN County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 12 February 1991.

*Lacy H. Thornburg, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*R. Marshall Bickett, Jr., for defendant-appellant.*

MEYER, Justice.

On Wednesday afternoon, 2 September 1987, in front of at least four witnesses including two of defendant's children, defendant stabbed his estranged wife, Freddie Mae, thirty-four times, and she died as a result thereof. On 9 November 1987, defendant was indicted for first-degree murder pursuant to N.C.G.S. § 14-17. The case was tried before a jury at the 22 May 1989 Criminal Session of Superior Court, Rowan County. At defendant's capital trial, defendant was convicted of murder in the first degree. During the sentencing phase, the jury found that the seven mitigating circumstances found were insufficient to outweigh the one aggravating circumstance found but that the aggravating circumstance was not sufficiently substantial to call for the death penalty, and accordingly recommended a sentence of life imprisonment. The trial court, following the recommendation of the jury, sentenced defendant to life imprisonment for the murder of his wife.

The State's evidence tended to show the following: The defendant had been married to the victim, Freddie Mae Bearthes, since 1965, and there were seven children born of the marriage. Defendant and his wife separated in June 1987. On 1 September 1987, the victim spoke with Eric Perry, her daughter Avis' boyfriend, to plan a trip the following day to Fort Jackson, South Carolina, to attend Avis' graduation from "boot camp." They and Mrs. Bearthes' youngest son and daughter, ages nine and eleven, were

to drive in Perry's car. Mr. Perry testified that after talking with Mrs. Bearthes on 1 September to make arrangements for the trip, he called the defendant later that night. Mr. Perry asked the defendant if he was going to the graduation. Defendant answered affirmatively, stating that he and his family were planning to go. Mr. Perry advised defendant that Mrs. Bearthes and the two younger children were planning to go with Mr. Perry in his car and that Mrs. Bearthes did not want defendant to go with them. Mr. Perry further testified that he had a prior discussion regarding the graduation with defendant, and at that time the defendant had told Mr. Perry that he was "tired of this," that it had been going on long enough, and that if he did not get his family back soon, something bad was going to happen.

About 1:00 or 1:30 p.m. on 2 September 1987, Mr. Perry picked up Mrs. Bearthes and the two children from the home of the victim's sister. As they left, Mr. Perry noticed the defendant was following them in a station wagon. The defendant pulled up beside Perry's car, and the victim rolled down her window and told him they were on their way to the graduation. They proceeded toward the house of a Ms. Beck, where Mr. Perry was stopping to pick up a cake he had ordered.

Upon arrival at Ms. Beck's residence, defendant came up behind in his car and stopped about five or ten yards away. Mr. Perry went inside the house to get the cake. The defendant got out of the car and walked up to the driver's side of Mr. Perry's car. Mrs. Bearthes started to roll up the window on that side. She was able to get the window up halfway before the defendant reached in and unlocked the door. Then defendant took a knife from his pocket, got into the car, and started stabbing Mrs. Bearthes. The two children got out of the car. Mr. Perry, upon hearing screaming, ran outside and saw his car shaking back and forth. He saw the defendant in the driver's seat and saw that the defendant had a long knife and was stabbing Mrs. Bearthes. He tried to pull the defendant off of the victim but was unsuccessful. He tried to get Mrs. Bearthes out of the car, but the defendant had her pinned down and was stabbing her.

Defendant, holding the knife, got out of Perry's car and went to the station wagon and drove away. Defendant left the scene, returned to his home, and subsequently turned himself in at the Rowan County Sheriff's Department.

Defendant testified at trial that he "somewhat" remembered what happened on 2 September 1987. He testified that he got up that day and fed the animals and then loaded his car with various items that Avis had asked him to bring to her in South Carolina. He then went to school to pick up the children, but they were not there. Defendant stopped at an intersection on his way home and spotted Mr. Perry's car with Mrs. Bearthes and the two children as passengers. Defendant testified that he followed the car because he wanted to find out where they were going. While stopped at a red light, defendant asked his wife where they were going, but before she had a chance to respond, the light changed and both vehicles drove off. When Mr. Perry's car stopped at a house, defendant stopped behind it. Defendant called to Mr. Perry, who was going into the house, because he was curious about where they were going, and then went over to Mr. Perry's car. Defendant testified that the last he remembered, he had opened the door and was getting ready to get into or was getting into the car and that the next thing he remembered was driving down North Main Street in his car, headed towards home. Defendant did not remember stabbing his wife.

Defendant further testified that after he got into the station wagon, he noticed blood on his hands, but he decided to continue home. Once home, defendant asked his son, Gabriel, to take him to the sheriff's department because he figured he had done something wrong. He testified that he told someone at the sheriff's department that he might have committed an assault of some kind. He remembered two deputies taking him to the hospital and asked them about his wife because he was concerned that she might be hurt.

On appeal, defendant brings forward eight assignments of error. After a thorough review of the transcript, record, briefs, and oral arguments, we conclude that defendant received a fair trial free of prejudicial error and affirm his conviction and sentence.

I.

[1] Defendant first contends that the trial court erred in denying his motion to appoint a new, independent psychiatrist to examine the defendant for the purposes of determining if his state of mind at the time of the commission of the offense would support a defense and then to assist him in evaluating, preparing, and presenting that defense at trial. Defendant was examined by four mental health experts upon the order of the trial court: Dr. Mauney, a psychiatrist

previously at Dorothea Dix Hospital, for the purpose of determining competency to stand trial; Dr. Manoogian, a psychologist and director of Manoogian Psychological Associates, who examined the defendant to aid in preparation of the defense; Dr. Groce, a forensic and clinical psychiatrist at Dorothea Dix Hospital, for the purposes of an examination and of assisting defendant in evaluating, preparing, and presenting a defense; and Dr. Lara, a forensic psychiatrist at Dorothea Dix Hospital, for the purpose of determining the competency of the defendant to proceed to trial. Defendant argues that because Dr. Groce, the psychiatrist who had been appointed to determine defendant's state of mind at the time of the offense and to assist in his defense, mailed the results of his examination of defendant to the district attorney, defendant is entitled to another psychiatrist. We disagree. The United States Supreme Court, in *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985), established a requirement that an indigent defendant be provided access by the state to a competent psychiatrist to determine whether his mental state at the time of the offense was such as would support an effective defense based on his mental condition and to assist in evaluation, preparation, and presentation of that defense. This requirement was satisfied by the trial court. Additionally, this Court has previously addressed and specifically rejected the very contention that defendant makes as to a defendant's entitlement to an independent, privately employed psychiatrist. *State v. Gambrell*, 318 N.C. 249, 347 S.E.2d 390 (1986).

During the pretrial hearing on defendant's motion questioning his capacity to proceed, Dr. Groce testified that he had concluded, after meeting with the defendant on five occasions, that the defendant had a mental illness, specifically, a mild adjustment disorder and a personality disorder which was not severe. Dr. Groce found the defendant's thought processes to be normal and coherent; he found no looseness of this thought process; the defendant was responsive and appropriate in his responses; there was no evidence of delusions or hallucinations; defendant appeared to be alert and well oriented; there was no evidence of a cognitive function impairment or any evidence of brain impairment in his mental status; and there was no evidence of psychosis or organic impairment of the brain. During the second interview, Dr. Groce informed the defendant that the examination would not be confidential because he was required to send a report to the court, including information discussed with him during the examination. The defendant did not

introduce at trial the report of the examination of defendant by Dr. Groce, nor did defense counsel call the psychiatrist as a witness in his defense. We hold that the trial court did not err in denying defendant's motion to appoint a new, independent psychiatrist because the *Ake* requirements were satisfied when defendant had *access* to an examination by Dr. Groce for the purposes of determining if defendant's state of mind at the time of the commission of the offense would support a defense and then of assisting him in evaluating, preparing, and presenting that defense at trial.

In addition, Dr. Manoogian did testify on behalf of the defendant that, at the request of defendant's counsel, he had examined the defendant on three occasions to assess any psychological issues relevant to defendant's case. He opined that when defendant stabbed his wife, his ability to exercise conscious control was impaired. Dr. Manoogian testified, however, on cross-examination, that defendant would be able to make plans and preparations for future events and had the ability to know the nature and quality of his acts.

The fact that the district attorney received a copy of Dr. Groce's report relating to his examination of defendant did not deny defendant his right to *access* to a competent psychiatrist for the purpose of assisting him in preparing his defense. Defendant's argument that he was entitled to a new psychiatrist because the State had access to Dr. Groce's report is unpersuasive because the requirements of *Ake* were satisfied at the time the independent examination was conducted. We find that the inadvertent mailing of the report to the district attorney after the examination was completed did not prejudice the defendant's access to a competent psychiatrist.

## II.

[2] Defendant also contends that the trial court erred by denying his motion to continue his case because the State had released discoverable information only two days prior to trial. Thirty-four continuances had been granted by the trial court to the State because trials of other cases prevented the trial of this case. At a discovery hearing on 15 May 1989, the trial court set a discovery deadline of Wednesday, 17 May 1989, for the State. However, on Friday afternoon, 19 May, two days before trial, the State disclosed discovery of the victim's diary, statements by defendant to witness Eric Perry, and statements made by defendant to Officers Johnston and Barber.

STATE v. BEARTHES

[329 N.C. 149 (1991)]

During an inquiry of the defendant by the trial court as to why the discovery justified a continuance, counsel for defendant only argued that:

> [COUNSEL FOR DEFENDANT]: One of the things we hope to accomplish, as you said, to pin [the prosecution] down on the record to see what is going to happen. We felt that introduction of these three new statements two days before the trial was—we just didn't have time to assimilate what was in them and to—
>
> THE COURT: Well, I mean I just heard about them but I don't know—what else is there to assimilate?

Thereupon, the trial court entered an order denying the motion to continue, finding that the principal grounds advanced upon oral argument by the defendant were late disclosures by the State of defendant's statements to law enforcement officers and to Perry; that the statements were not lengthy and were rather straightforward; that the statements contained no matter that would justify continuing the case for the session; that the trial court perceived no discernible prejudice to the defendant which would result if the case was tried on schedule; and that the defendant had advanced no reason or grounds sufficient to compel a continuance, and thus concluding that there was no basis in fact or in law to justify continuing the case.

Defendant argues that fundamental fairness should dictate that a continuance was necessary for the defense to properly evaluate the newly discovered information. We disagree. Even when a motion to continue raises constitutional issues, the denial of the motion is grounds for a new trial only upon a showing by the defendant that the denial was erroneous and that his case was prejudiced as a result of the error. *State v. Branch*, 306 N.C. 101, 291 S.E.2d 653 (1982). A motion for a continuance should be supported by an affidavit showing sufficient grounds. *State v. Horner*, 310 N.C. 274, 311 S.E.2d 281 (1984). The defendant must present *adequate* and *specific* circumstances of the case to support his claim of a constitutional violation. *Id.; State v. Harrill*, 289 N.C. 186, 221 S.E.2d 325 (1976).

In the case *sub judice*, defense counsel only asserted that he required additional time to review and "assimilate" the material but failed to identify or articulate any basis upon which any part

of the recently provided discovery necessitated additional investigation or preparation. We hold that the trial court properly denied the defendant's motion to continue because defendant failed to show that the content of the discovery provided to the defendant two days prior to trial was of such a nature as to require additional time for the preparation of his defense.

## III.

[3] Defendant contends next that the trial court erred in excusing a prospective juror for cause when he was equivocal on whether he could vote to impose the death penalty. Defendant argues that jurors may be excused for cause only if they are unequivocally opposed to the death penalty or if they would "automatically" vote against capital punishment. Defendant submits that juror Truesdale, who would find it difficult to recommend the death penalty but "[could] uphold the law," should not have been excused for cause. We disagree.

It is well settled that where the answers of a prospective juror to questions of the prosecution or the trial court clearly disclose that his views would impair his ability to act in accordance with his instructions and his oath, such juror may be properly excused for cause. *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985); *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909 (1989), *sentence vacated on other grounds in light of McKoy*, --- U.S. ---, 108 L. Ed. 2d 756 (1990). Juror Truesdale stated that he did not believe in the death penalty and was against it based on religious beliefs; that he thought it would be impossible for him to return a verdict recommending the death penalty in the case; that he could not consider returning a verdict knowing that, pursuant to that verdict, the defendant would be sentenced to death; that he doubted he could do it under any circumstances; that he thought that he would automatically vote against the imposition of the death penalty based on his feelings and beliefs; that he did not think there were any circumstances under which he would vote to put the defendant to death; that given the choice between the death penalty and life imprisonment, he could never vote for the death penalty; and that when asked "Never?" the juror responded that he did not think so and that he thought that would be true no matter what the evidence showed.

We conclude that the responses of juror Truesdale to questions of the State and the trial court revealed that his views about

STATE v. BEARTHES

[329 N.C. 149 (1991)]

the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Furthermore, because the defendant did not receive the death penalty, he did not suffer prejudice by the excusal of juror Truesdale for cause on that basis.

## IV.

[4] Next, defendant contends that the trial court erred in conducting an entire voir dire examination of a potential alternate juror for the State. The only question asked by the prosecutor during the voir dire of prospective juror Morgan was, "Did you pass him, Your Honor?" The questioning of juror Morgan about which the defendant complains consists of the following:

Q. [THE COURT:] You have been able to hear what has been said to these other jurors?

A. Yes, sir.

Q. Do you know anything in the world about this case?

A. No, sir.

Q. Do you know any of the lawyers?

A. No, sir.

Q. For either side?

A. No.

Q. Know the defendant?

A. No, sir.

Q. Did they call out any names as witnesses you know?

A. No, sir.

Q. Haven't read anything about it?

A. No, sir.

Q. Have an open mind about it?

A. Yes, sir.

Q. Know any reason in the world why you can't be fair and impartial?

A. No, sir.

Q. Let the chips fall where they will?

A. No, sir.

Q. You do know of a reason?

A. No.

Q. Do you have any conscientious objection to the death penalty?

A. No, sir.

THE COURT: Any other questions you want to ask this juror?

[STATE]: Did you pass him, Your Honor?

THE COURT: Well, he says he can be fair.

[STATE]: I will pass him.

THE COURT: What says the defendant to the juror.

We note that defendant did not object at trial to the examination of the juror by the trial court. Although defendant's failure to object at trial constitutes a waiver of the right to assert the alleged error on appeal, we elect to address this contention. The trial court did not question any potential juror for the defense, and defendant argues that the trial judge's unequal treatment of the prosecution and defense by conducting the entire questioning and selection of a juror in a capital case indirectly conveyed to the jury that the trial judge and the prosecution were "on the same side," and therefore, the defendant was prejudiced.

N.C.G.S. § 15A-1222 provides:

The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury.

N.C.G.S. § 15A-1222 (1988); see State v. King, 311 N.C. 603, 320 S.E.2d 1 (1984) (the trial court is prevented from expressing any opinion in the presence of the jury on any question of fact to be decided by it during any stage of the trial); State v. Guffey, 39 N.C. App. 359, 361, 250 S.E.2d 96, 97 (1979) (a new trial is required if a statement by a trial judge expresses an opinion which goes to the "heart of the trial" and assumes the defendant's guilt).

A review of the record and circumstances in the instant case shows that the questioning of the prospective juror by the trial court did not constitute an opinion on any question of fact, or a statement expressing an opinion which went to the "heart of the trial" and did not assume the guilt of the defendant. We hold that the questioning by the trial court was not improper because the inquiry by the trial court constituted neither an expression of opinion as to the guilt or innocence of the defendant nor a suggestion of alliance with the prosecution.

V.

[5] By his fifth assignment of error, defendant contends that the trial court erred in admitting twelve pictures of the autopsy into evidence. Defendant admitted that the numerous knife wounds to the body were the cause of death and entered into a judicial admission to that effect. Defendant argues that pursuant to Rule 403 of the North Carolina Rules of Evidence the probative value of these photographs was substantially outweighed by the unfair prejudice. *See State v. Hennis*, 323 N.C. 279, 284, 373 S.E.2d 523, 526 (1988) ("when the use of photographs that have inflammatory potential is excessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury"). Defendant submits that since he had stipulated to the cause of death and witnesses were available to testify as to the cause of death, the photographs lacked probative value, and the error resulting from the admission of the photographs requires a new trial. We disagree.

Photographs of a victim's body are not only admissible to illustrate testimony as to the cause of death, but also to illustrate, in a murder trial, testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree. *Id.; State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402 (1990). The fact that photographs of a homicide victim are gory, gruesome, horrible, or revolting will not preclude admission so long as the photographs are used for illustrative purposes and are not excessive or repetitious. *State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402. Whether the use of photographic evidence is more probative than prejudicial pursuant to Rule 403 and what constitutes an excessive number of photographs lies within the discretion of the trial court. *Id.; State v. Sledge*, 297 N.C. 227, 254 S.E.2d 579 (1979).

STATE v. BEARTHES

[329 N.C. 149 (1991)]

Defendant was charged with murder in the first degree. However, the jury was instructed on murder in both first and second degree. Dr. Thompson, a forensic pathologist who supervised the autopsy performed on Mrs. Bearthes, used the photographs for the purpose of illustrating his testimony. The photographs were received into evidence with a limiting instruction by the trial court that they were for the purpose of illustrating and explaining Dr. Thompson's testimony and were not substantive evidence. We find that these photographs served to illustrate testimony regarding the manner of the killing so as to prove circumstantially the elements of murder in the first degree. This assignment of error is without merit.

## VI.

[6] Next, defendant contends that the trial court erred in allowing the medical examiner to testify as to the amount of time it would take the victim to die from each individual wound. The medical examiner testified that the deceased suffered twenty-three life-threatening wounds, all while she was alive, and that Mrs. Bearthes died from these wounds within a three- to five-minute period. The prosecutor was allowed to ask repeatedly how long it would have taken her to die from each individual wound. The medical examiner testified that one wound would have taken "ten to fifteen minutes," another "ten minutes," and one even up to "30 minutes." Defendant argues that since the medical examiner had previously testified that Mrs. Bearthes *had* died within five minutes, this additional hypothetical questioning would only tend to confuse the issues and to prejudice the defendant. We disagree.

Rule 702 of the North Carolina Rules of Evidence permits a witness properly qualified as an expert to testify in the form of an opinion when specialized knowledge will assist the trier of fact to determine a fact in issue. N.C.G.S. § 8C-1, Rule 702 (1988). In determining whether a defendant acted after premeditation and deliberation, the nature of wounds to a victim is a circumstance to be considered. *State v. Bray*, 321 N.C. 663, 365 S.E.2d 571 (1988). Dr. Thompson, associate chief medical examiner who supervised the performance of the autopsy on Mrs. Bearthes, testified that in the defendant's deadly assault, the defendant inflicted twenty-three major wounds, as well as numerous others, upon Mrs. Bearthes. We find that Dr. Thompson's opinions were within his area of expertise and that his opinions were relevant and appropriate to

show the number and severity of the wounds. We discern no merit in this assignment of error.

## VII.

[7] Defendant contends that the trial court erred by admitting a "clarifying statement" which was obtained from the defendant through questioning after the defendant had been advised of his constitutional rights and had informed the officer, three times, that "I'd better not say anything else." Detective Johnston, after orally advising defendant of his rights, asked him questions concerning the knife and whether he had stabbed his wife. Defendant argues that admitting into evidence statements by defendant made while he was in custody, being interrogated, and when he had not waived his right to remain silent constituted error. We disagree.

Officer Johnston testified that he accompanied Mrs. Bearthes' body to the hospital on 2 September 1987. He was informed that defendant was being transported to the hospital and for him to stand by. When the defendant arrived at the emergency room, Officer Johnston read defendant his rights, and defendant answered affirmatively that he understood them. During voir dire of the officer, he testified that while he was at the emergency room, defendant started making statements about what happened and then he stated that "[he]'d better not say anything else." The officer did not ask defendant any questions at that time. After an hour, defendant started talking and made more statements about the events. The officer again asked no questions. Later, defendant made statements relative to his going to the sheriff's office earlier. At this point, the officer asked him what kind of knife defendant had used and where it was. Defendant responded that it was a straight knife like a small hunting knife and that it was in one of his cars. When another officer arrived, Officer Johnston relayed this information, and the defendant restated what had happened.

After voir dire, the trial judge entered an order in which he found that the defendant had been advised of his constitutional rights and that defendant had responded affirmatively when asked if he understood his rights; that Officer Johnston stood security over defendant in the emergency room; that Officer Johnston did not initiate conversation or interrogation at the time; that defendant was not under medication; that defendant, not in response to any question by the officer, volunteered statements which did not result from any custodial interrogation; that Officer Johnston

asked defendant two clarifying questions with respect to matters disclosed by defendant as to what kind of knife was used and where it was; that these were not asked by the officer until defendant had made his statement; that defendant ratified his statement to a second officer; that the statements were freely and voluntarily made; and that defendant knowingly waived his right to remain silent. Upon entry of the order, Officer Johnston continued to testify about the voluntary statements by defendant. We find that the statement that "[he]'d better not say anything else" coupled with the findings by the trial court did not constitute a violation of his constitutional rights.

The defendant, by taking the stand and testifying that he had no recollection of the events, opened the door to admission of the prior inconsistent statements for the purpose of impeachment of his testimony. *See State v. McQueen*, 324 N.C. 118, 377 S.E.2d 38 (1989). This Court stated:

> "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment."

*Id.* at 134-35, 377 S.E.2d at 48 (quoting *Harris v. New York*, 401 U.S. 222, 225-26, 28 L. Ed. 2d 1, 4-5 (1971)). Defendant testified on direct examination that he did not remember stabbing his wife and that he did not remember having a knife in his hand at all. The testimony of Officer Johnston as to prior inconsistent statements of the defendant was offered for the purpose of impeaching or rebutting that testimony. We find that defendant, by taking the stand and testifying that he had no recollection of these events, opened the door to admission of the prior inconsistent statements for the purpose of impeachment of his testimony.

## VIII.

[8] Finally, defendant contends that the trial court erred by allowing into evidence testimony concerning the defendant's "threat"

to Eric Perry. On Friday, 19 May 1989, two days before trial, during an interview by the district attorney of State's witness Eric Perry, Perry for the first time disclosed that at some time prior to the date of the murder, the defendant had made the statement: "If I [defendant] don't get my family back soon, something bad is going to happen." The district attorney immediately contacted defense counsel by telephone and disclosed the existence of the statement. Defendant argues that pursuant to the discovery statute, N.C.G.S. § 15A-903 (1988), and because of noncompliance by the State with the discovery deadline imposed by the trial court, the statement containing the threat made by defendant to Eric Perry should not have been admitted. We disagree.

N.C.G.S. § 15A-903(a)(2) requires the State to disclose to the defendant the substance of any relevant statement made by the defendant which is in the possession of the State and the existence of which is known to the prosecutor. This subsection provides, in part:

> If the statement was made to a person other than a law-enforcement officer and if the statement is *then known to the State*, the State must divulge the substance of the statement no later than 12 o'clock noon, on Wednesday prior to the beginning of the week during which the case is calendared for trial.

N.C.G.S. § 15A-903(a)(2) (1988) (emphasis added). The language of the subsection requires disclosure of the substance of the statement if the statement is "then known to the State." In the instant case, the explanation by the district attorney, together with the testimony of State's witness Eric Perry on voir dire, established that the State was not aware of the statement on the Wednesday prior to the week of trial. We find that the statement does not come within the scope of N.C.G.S. § 15A-903(a)(2).

Additionally, the sanctions contained in N.C.G.S. § 15A-910 provide that:

> If at any time during the course of the proceedings the court determines that a party has failed to comply with this Article or with an order issued pursuant to this Article, the court in addition to exercising its contempt powers *may*
>
>     . . . .

(3) Prohibit the party from introducing evidence not disclosed
. . . .

N.C.G.S. § 15A-910 (1988) (emphasis added). These sanctions are permissive, not mandatory, and defendant has failed to establish that the trial court abused its discretion in denying his motion to suppress the testimony relating to defendant's statement. Therefore, this assignment of error is without merit.

We conclude that defendant received a fair trial free of prejudicial error and affirm his conviction and sentence.

No error.