445 S.E.2d 1 (1994)
336 N.C. 1
STATE of North Carolina
v.
Kerry Lemar MORSTON.
No. 353A92-Hoke.
Supreme Court of North Carolina.
June 17, 1994.
*4 Michael F. Easley, Atty. Gen. by Valerie B. Spalding, Asst. Atty. Gen., for the State.
Malcolm R. Hunter, Jr., Appellate Defender by Daniel R. Pollitt, Asst. Appellate Defender, for defendant-appellant.
MITCHELL, Justice.
On 13 May 1991, the Hoke County Grand Jury indicted the defendant, Kerry Lemar Morston, for first-degree murder and conspiracy to commit first-degree murder. On 19 August 1991, the Grand Jury indicted the defendant for assault with a deadly weapon with intent to kill, inflicting serious injury and for discharging a firearm into occupied property. He was tried capitally at the 27 April 1992 Mixed Session of Superior Court, Hoke County. The jury returned verdicts finding the defendant guilty of premeditated and deliberate first-degree murder and all of the other charges against him.
At the conclusion of a separate capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment for the firstdegree murder conviction. The trial court sentenced the defendant in accord with the jury's recommendation. The trial court also sentenced the defendant to thirty years imprisonment for conspiracy to commit firstdegree murder, twenty years imprisonment *5 for assault with a deadly weapon with intent to kill inflicting serious injury and ten years imprisonment for discharging a firearm into occupied property. Under the judgments entered by the trial court, these latter three sentences are to be served consecutively to each other and to the life sentence imposed for the first-degree murder conviction. The defendant appealed to this Court as a matter of right from the judgment sentencing him to life imprisonment for first-degree murder. See N.C.G.S. § 7A-27(a) (1989). We also allowed his motion to bypass the Court of Appeals on his appeal from the additional judgments.
The State's evidence tended to show the following. Shortly after 7:00 p.m. on 4 April 1991, members of the Southern Pines Police Department, including the victim, Detective Ed Harris, investigated a report of gunshots at the Holiday Town Apartments in Southern Pines, North Carolina. A large group gathered in the parking lots and grassy common areas of the apartment complex and a heated exchange of words took place between Detective Harris and Bernice McDougald, a reputed drug dealer.
After the officers left the apartment complex, McDougald met with seven other people, including the defendant. McDougald told the group that Detective Harris was "fing up the business" and that he was going to "get rid of Harris that night. At the time McDougald made these statements, three members of the group, including the defendant, were armed. Two of the group members held 30-30 rifles, while the defendant was armed with a 9-millimeter semiautomatic handgun. McDougald subsequently procured his own 30-30 rifle.
Once McDougald had armed himself, he told another member of the group, Shannon McKenzie, that McKenzie was to knock on the front door of Harris' home. McDougald instructed the defendant that when Harris answered the door, the defendant was to "shoot the s out of him." The defendant made no reply. McDougald then stated that he would also shoot Harris.
The group traveled by car to the Harris residence in another part of Southern Pines. While in the car, McDougald told the group that if anyone wanted to back out, they could. The defendant then stated that he was going to do what he had to do and that if he saw fear in anyone's eyes, he would kill them.
The group arrived at the Harris residence around 10:00 p.m. They drove a short distance beyond the house and stopped. The driver, John Chisolm, was told to drive around and return in twenty-five minutes. The other seven members of the group, including the defendant, then walked to Detective Harris' home. As they approached the house, a car pulled up and Harris' son, Anthony, got out of the car and went inside the house.
After the car drove away, Shannon McKenzie and the defendant walked to the front door of the Harris residence. McKenzie rang the doorbell and ran. Harris was sitting in his den with his wife, Judy, when the doorbell rang. Harris got up and opened the door leading from the den into a utility room. At the opposite end of the utility room was the front door to the house. Detective Harris closed the door leading into the den, turned on the front porch light and opened the front door. The defendant then shot Harris at least four times through the screen and glass storm door. McDougald also shot Harris. The defendant ran away from the house toward the highway, where he found McKenzie, Chisolm and the getaway car. Once in the car, the defendant exclaimed, "I got him, I got him."
McKenzie explained at trial that because Chisolm "looked scary," the defendant and McKenzie got out of the car and began running. They eventually came upon McDougald, who was with two other members of the group. After walking for some time, the five men decided to go to the mobile home of one Anna Hurd. Once there, they washed themselves and McDougald wiped down the weapons and hid them under a bed. McDougald also sprayed himself with Hurd's perfume so that anyone who subsequently encountered him would think that he had been with a woman.
McDougald asked Hurd to drive the men to the Fox Club, a local nightclub. After passing a police car on the road, however, *6 McDougald decided that he did not want to go to the Fox Club, so he asked Hurd to drive them to "the projects."
The following morning, Anna Hurd learned of Detective Harris' murder from a television news report and drove to the Holiday Town Apartments. She saw the defendant and Terry Evans, another of the eight men who had travelled to Detective Harris' home the previous night. As Hurd approached and asked what was going on, both men smiled and Evans began to chant, "Ed is dead, Ed is dead." The defendant then said to Hurd, "We did it. Yes, you heard what he said, we did it. We did it, we did it. It is finished." The defendant then walked over to Hurd's car, in which Hurd's niece, Patrice Hurd, was sitting. The defendant told Patrice that he had shot Detective Harris. The defendant said that he was expecting to collect $20,000 and asked Patrice if she wanted to accompany him to the Bahamas.
Bullets or parts of bullets had also traveled through the door leading into the den of the Harris home. One of these bullets had severed one of Judy Harris' fingers. After hearing the shots, Anthony Harris had run into the utility room and had found his father lying in a pool of blood and glass. Detective Harris was still conscious and attempted to speak to Anthony. Although he could not make it out clearly, Anthony thought his father said, "Wendell McLaurin" and "black, male, projects." Mrs. Harris had then pulled Detective Harris' patrol car around to the front of the house and Anthony placed Detective Harris in the backseat of the car. On their way to the hospital, Anthony attempted in vain to revive his father.
An autopsy revealed that Detective Harris had suffered gunshot wounds to the face, wrist, chest, back and abdomen. These wounds caused his death. The defendant presented no evidence at his trial. Other pertinent evidence is discussed at other points in this opinion where it is relevant.
By his first assignment of error, the defendant contends that his convictions and sentences for conspiracy to commit first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and discharging a firearm into occupied property must be vacated because they arose out of the same conduct underlying the first-degree murder conviction and therefore constitute improper multiple punishments for the same offense. Specifically, the defendant insists in his brief that he "is unfairly being punished sixty extra years in three multiple convictions even though he only had one course of conduct involving one mental element and one physical act." He therefore maintains that the trial court erred in denying his motions to dismiss those charges at the close of the State's evidence and his motions to arrest the judgments entered on those charges. We disagree.
We first observe as a general matter that "it is well established that two or more criminal offenses may grow out of the same course of action." State v. Fulcher, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978). In such a situation, "the perpetrator may be convicted of and punished for both crimes." Id. at 524, 243 S.E.2d at 352. We now turn to the defendant's specific arguments regarding each of his convictions.
With regard to his conviction for conspiracy to commit first-degree murder, the defendant argues that where, as here, a defendant "is separately being punished for murder," a conviction for conspiracy to commit murder "should not lie." It is a fundamental principle of substantive criminal law, however, that a defendant properly may be convicted of, and punished for, both conspiracy and the substantive offense which the defendant conspired to commit. See, e.g., State v. Lowery, 318 N.C. 54, 74, 347 S.E.2d 729, 742-43 (1986); State v. Brewer, 258 N.C. 533, 559-60, 129 S.E.2d 262, 280-81, appeal dismissed, 375 U.S. 9, 84 S.Ct. 72, 11 L.Ed.2d 40 (1963). This is so because "`the crime of conspiracy is a separate offense from the accomplishment or attempt to accomplish the intended result.'" Lowery, 318 N.C. at 74, 347 S.E.2d at 742 (quoting State v. Small, 301 N.C. 407, 428 n. 14, 272 S.E.2d 128, 141 n. 14 (1980)). Therefore, the defendant in the present case properly was convicted of, and punished for, both conspiracy to commit murder and first-degree murder.
*7 With regard to his conviction for assault with a deadly weapon with intent to kill inflicting serious injury, the defendant insists that the trial court erred in failing to dismiss the charge or arrest judgment on the conviction because he had no intent to assault Judy Harris. He argues that the evidence at trial only tended to show that his assault upon Mrs. Harris was "incidental" to the shooting of Detective Harris. In its instructions on the felonious assault charge, the trial court instructed the jury on the doctrine of transferred intent. Under this doctrine, "it is immaterial whether the defendant intended injury to the person actually harmed; if he in fact acted with the required mental element toward someone, that intent suffices as the intent element of the crime charged as a matter of substantive law." State v. Locklear, 331 N.C. 239, 245, 415 S.E.2d 726, 730 (1992) (emphasis added); see also State v. Wynn, 278 N.C. 513, 519, 180 S.E.2d 135, 139 (1971) ("It has been aptly stated that `[T]he malice or intent follows the bullet.'"). The requisite mental state for assault with a deadly weapon with intent to kill inflicting serious injury is the intent to kill. See State v. Reid, 335 N.C. 647, 654, 440 S.E.2d 776, 780 (1994); see also N.C.G.S. § 14-32(a) (1993). The defendant in the present case concedes that the evidence tended to show that he possessed the intent to shoot and kill Detective Harris. Under the doctrine of transferred intent, this intent suffices as the intent element for the felony of assault upon Mrs. Harris with a deadly weapon with intent to kill inflicting serious injury.
The defendant further maintains that where a defendant is being punished separately for murder, an assault conviction arising out of the same circumstances surrounding the murder and based on the doctrine of transferred intent "should not lie." However, the defendant fails to cite, and we have not found, any authority to support this proposition. We conclude that the defendant in the present case was properly convicted of, and punished for, assault with a deadly weapon with intent to kill inflicting serious injury.
With regard to his conviction for discharging a firearm into occupied property, the defendant argues that the trial court erred in failing to dismiss the charge or arrest judgment upon his conviction because he did not intend to discharge a firearm into occupied property. He argues that the evidence only tended to show that he intended to shoot Detective Harris "wherever and whenever he first saw him." The evidence presented at the defendant's trial belies this assertion, however. The evidence tended to show that Bernice McDougald instructed Shannon McKenzie that McKenzie was to knock on the front door of Detective Harris' home. When Harris came to the door, the defendant was to shoot Harris immediately. McDougald, McKenzie, the defendant and five others then drove to the Harris residence and executed their plan. This was sufficient evidence from which a rational trier of fact could find, as the jury did in this case, that the defendant intended to fire his weapon into an occupied dwelling. See State v. Wilson, 315 N.C. 157, 163, 337 S.E.2d 470, 474 (1985) ("While intent is a state of mind sometimes difficult to prove, the mind of an alleged offender may be read from his acts, conduct, and inferences fairly deducible from all of the circumstances.").
The defendant also maintains that there is no rationale to support the discharging a firearm conviction in the present case because the purpose underlying this offense, which the defendant believes to be "to protect unknown and unseen occupants of a dwelling from being hit by a bullet," was satisfied by his assault conviction. In State v. Shook, 293 N.C. 315, 237 S.E.2d 843 (1977), we held that a defendant properly could be convicted of, and punished for, both discharging a firearm into occupied property and assault with a deadly weapon inflicting serious injury. In Shook, the defendant fired into a tavern which was occupied by a number of patrons. While the shots were intended for one Yarborough, whose automobile the defendant thought he had identified outside of the tavern, one of the bullets penetrated a piece of plywood and struck another patron. The defendant complained that the trial court erred in denying his motion to arrest judgment because the two offenses in fact constituted only one offense, thereby exposing him to double jeopardy. We rejected *8 this contention, explaining that the two offenses are "entirely separate and distinct." Id. at 320, 237 S.E.2d at 847. Although Shook dealt with a double jeopardy challenge, it is instructive in the present case. We conclude that discharging a firearm into occupied property and assault with a deadly weapon with intent to kill inflicting serious injury are separate and distinct offenses which serve distinct purposes. The defendant in the case at bar was properly convicted of, and punished for, both offenses.
Having rejected the defendant's general assertions in support of this assignment and his specific arguments regarding each offense, we conclude that this assignment of error is without merit.
By his next assignment of error, the defendant argues that he is entitled to a new trial because the trial court erroneously denied his motion for a mistrial on the ground that the prosecutor had improperly referred to his exercise of his right to remain silent following his arrest. We do not agree.
Prior to trial, the defendant moved to prohibit the State from making any reference to his exercise of his right to remain silent. The trial court ordered the State "not to present any evidence that the [d]efendant refused to make a statement after having been advised of his Miranda rights," but stated that it would allow the State to "present evidence that the [d]efendant was advised of and understood his Miranda rights." At trial, the prosecution called SBI Agent Michael Wilson who testified that he had interviewed Anna Hurd on the day after Detective Harris' murder. The following dialogue then took place:
[PROSECUTOR]: Did you interview anybody else that day?
[WILSON]: Yes, sir, I did.
[PROSECUTOR]: What other individual did you interview?
[WILSON]: I interviewed [the defendant].
[PROSECUTOR]: What time was the first time you saw [the defendant]?
[WILSON]: The first time I saw [the defendant] was at approximately 9:15 or 9:20 p.m. on ... April 5th.
At this point the defendant's counsel objected and moved to strike. Out of the jury's presence, the prosecutor explained that he was merely attempting to elicit the exact time of the defendant's arrest, which he explained was "important ... based on some of the cross-examination that [the defendant's counsel] has heretofore engaged in." The defendant's counsel then moved for a mistrial. The trial court denied the motion for a mistrial and sustained the defendant's objection to the prosecutor's last question. The trial court then told the prosecutor that since there was "not an interview as such," the matter "needs to be corrected" so as not to "leav[e] the jury with an inappropriate notion." The prosecutor replied, "I will just ask the officer did he interview the defendant. Is that satisfactory?" The defendant's counsel responded, "Yes, that's all right."
The jury was returned to the courtroom and Agent Wilson testified that the defendant had been arrested "at approximately 9:15." The following dialogue then occurred:
[PROSECUTOR]: You did not interview him at that time, did you?
[WILSON]: No, I did not.
[PROSECUTOR]: Would that be a.m. or p.m.?
[WILSON]: That would be p.m.
[PROSECUTOR]: On what date?
[WILSON]: April 5th, 1991.
The trial court then excused the jury while the court and both parties discussed an unrelated matter.
While the jury was out of the courtroom, the defendant's counsel renewed his previous objection and motion for a mistrial, explaining that he was expecting the prosecutor to establish that Agent Wilson had not interviewed the defendant at any time. The trial court instructed the prosecutor to clarify the matter immediately. Upon the jury's return to the courtroom, the prosecutor clarified the matter as follows:
[PROSECUTOR]: Just to clarify one thing, Special Agent Wilson, you never at any time interviewed the defendant, is that correct?
[WILSON]: That's correct.
*9 The defendant now contends that the prosecutor's examination of Agent Wilson constituted an "erroneous unconstitutional comment" on the defendant's exercise of his right to remain silent. Specifically, the defendant argues that the combination of Agent Wilson's original testimony that he had interviewed the defendant and the lack of any evidence regarding any statement given by the defendant led the jury to conclude either that he had refused to give a statement or that he had successfully suppressed an inculpatory statement. The defendant further maintains that the trial court's attempts to remedy the error only served to compound the prejudice by unduly emphasizing Agent Wilson's testimony. Finally, the defendant insists that a mistrial was warranted because the prosecutor's improper examination of Agent Wilson was an intentional violation of the court's pretrial order.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States explained that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation." Id. at 468 n. 37, 86 S.Ct. at 1625 n. 37, 16 L.Ed.2d at 720 n. 37; see also State v. Williams, 305 N.C. 656, 673-74, 292 S.E.2d 243, 254, cert, denied, 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982), reh'g denied 459 U.S. 1189, 103 S.Ct. 839, 74 L.Ed.2d 1031 (1983) (explaining that arguments of this sort are based on footnote thirty-seven of Miranda. Therefore, the prosecution in a criminal trial may not "use... the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." Id. This Court has affirmed this principle in a number of cases. See, e.g., State v. Jennings, 333 N.C. 579, 604, 430 S.E.2d 188, 199-200, cert, denied, ___ U.S. ___, 114 S.Ct. 644, 126 L.Ed.2d 602 (1993); State v. Ladd, 308 N.C. 272, 283, 302 S.E.2d 164, 171 (1983); State v. McCall, 286 N.C. 472, 483-84, 212 S.E.2d 132, 139 (1975).
In the present case, however, the prosecution did not make use of the defendant's exercise of his right to remain silent following his arrest. Neither the prosecutor's questions nor Agent Wilson's responses ever expressly referred to the defendant's exercise of his right to remain silent during custodial interrogation. Instead, Agent Wilson twice clarified that he had not actually interviewed the defendant. Therefore, we conclude that the State's examination of Agent Wilson did not constitute an improper comment on the defendant's exercise of his right to remain silent. The trial court thus did not err in denying the defendant's motion for a mistrial. We reject this assignment of error.
By another assignment of error, the defendant maintains that he is entitled to a new trial because the trial court erroneously allowed a State's witness to invoke the attorney-client privilege and thereby refuse to answer certain questions on cross-examination. We disagree.
The witness in question, Mr. Charles L. Hicks, had briefly served as Shannon McKenzie's appointed counsel until McKenzie's family retained a private attorney. The State called Mr. Hicks for the purpose of corroborating McKenzie's testimony. Mr. Hicks testified, over the defendant's objection, that he had engaged in a three-hour conversation with McKenzie on 9 April 1991, during which McKenzie and he had discussed the events surrounding the murder of Detective Harris. Mr. Hicks then read to the jury a lengthy memorandum he had generated detailing the substance of his conversation with McKenzie.
On cross-examination, the defendant's counsel asked Mr. Hicks whether McKenzie and he had discussed "the potential benefits of making some type of a statement that would be conceivably useful to the State." Mr. Hicks responded by invoking the attorney-client privilege and professing his belief that "I have authority from my client to testify as to what he told me happened that particular night and nothing further." On redirect examination, Mr. Hicks testified that McKenzie had not entered into any agreement with the State during the period of Mr. Hicks' representation. On re-cross examination, Mr. Hicks again invoked the attorneyclient privilege when asked whether McKenzie and he had discussed "the benefits of making a deal."
*10 The defendant now contends that the trial court erred in allowing Mr. Hicks, based upon the attorney-client privilege, to refuse to answer, because McKenzie's waiver of the privilege with regard to a portion of the conversation (the portion dealing with the events surrounding Detective Harris' murder) constituted a waiver of the privilege with regard to the entire conversation. Assuming, arguendo, that the trial court erred in permitting Mr. Hicks to refuse to answer and that the error was of constitutional magnitude, we conclude that the error was harmless. See N.C.G.S. § 15A-1443(b) (1988).
The defendant insists that the trial court's alleged error was prejudicial because it deprived him of evidence that McKenzie had contemplated a plea arrangement with the State and therefore "had an early scheme and motive to lie." McKenzie himself had already testified, however, that the State had permitted him to plead guilty to second-degree murder and conspiracy to commit murder in exchange for his truthful testimony at the defendant's trial. McKenzie also read the terms of his plea arrangement to the jury. Although McKenzie testified that he had not reached an agreement with the State regarding his sentence, he admitted on crossexamination that his testimony had kept him "from facing the death penalty" and that he hoped his testimony would "help" him when it came time for him to be sentenced. In light of such evidence, any testimony by Mr. Hicks to the effect that McKenzie and he had discussed the possible benefits of a plea arrangement would have been cumulative evidence. Thus, the record before us clearly establishes that any error in allowing Mr. Hicks to refuse to testify about any such discussion was harmless beyond a reasonable doubt. We therefore reject this assignment of error.
By his next assignment of error, the defendant contends that the trial court erroneously overruled his objections during the guilt determination phase of his trial to expert testimony regarding the painful nature of Detective Harris' wounds. Dr. Deborah L. Radisch, the Associate Chief Medical Examiner of the State of North Carolina, performed the autopsy on Detective Harris' boay. Dr. Radisch testified on behalf of the State that Detective Harris had suffered gunshot wounds to his face, wrist, chest, back and abdomen. Over the defendant's objection, Dr. Radisch also testified about the pain Detective Harris would have experienced as a result of the wounds to his chest, abdomen, wrist and back. The defendant insists that the trial court erred in overruling his objections to this testimony because it was irrelevant and therefore inadmissible. We disagree.
In State v. Bearthes, 329 N.C. 149, 405 S.E.2d 170 (1991), we explained that "[i]n determining whether a defendant acted after premeditation and deliberation, the nature of [the] wounds to a victim is a circumstance to be considered." Id. at 162, 405 S.E.2d at 177. We therefore concluded that expert testimony from the medical examiner who had performed the autopsy on the victim regarding the amount of time it would have taken the victim to die from each individual wound was relevant and admissible "to show the number and severity of the wounds." Id. at 162-63, 405 S.E.2d at 177; see also State v. Ginyard, 334 N.C. 155, 159, 431 S.E.2d 11, 13 (1993); State v. Bray, 321 N.C. 663, 671, 365 S.E.2d 571, 576 (1988). Similarly, we conclude in the present case that Dr. Radisch's testimony regarding the pain associated with the individual wounds suffered by Detective Harris was relevant and admissible; it tended to show the severity and nature of the wounds and assisted the jury in determining whether the defendant acted after premeditation and deliberation. Accordingly, this assignment of error is without merit.
By another assignment of error, the defendant argues that the trial court erred in failing to exclude hearsay testimony of two State's witnesses. The first of these witnesses, Scott Fairly, testified that he was present when the defendant and his accomplices conspired to murder Detective Harris, but that he did not accompany the group to the Harris residence. Over the defendant's objection, Fairly testified about a number of statements made by Bernice McDougald in the defendant's presence. On appeal, the defendant specifically complains of the following *11 statements made in the defendant's presence by McDougald on the night of the murder and subsequently related to the jury by Fairly: (1) that Detective Harris was "fing up the business," (2) that McDougald needed money to buy a house and Detective Harris was "in the way of making this money," (3) that McDougald had flushed an ounce of cocaine down a toilet on the night of the murder and (4) that Harris "is just fing me up. I need me a house." The second witness in question, Anna Hurd, testified over the defendant's objection that while she was driving the five members of the group to the Fox Club, someone said to her that if they came upon a roadblock, she was "to stop and let them out," that she would then be "on [her] own" and that if anyone asked, she "hadn't seen them." The defendant insists that by overruling his objections to this testimony, the trial court improperly allowed the State to elicit inadmissible hearsay statements made by Bernice McDougald and other members of the group that conspired to murder Detective Harris. We do not agree.
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). However, "[w]hen evidence of such statements by one other than the witness testifying is offered for a proper purpose other than to prove the truth of the matter asserted, it is not hearsay and is admissible." State v. Coffey, 326 N.C. 268, 282, 389 S.E.2d 48, 56 (1990); see also State v. Reid, 335 N.C. 647, 661, 440 S.E.2d 776, 784 (1994). For example, a statement made by one person to another is not hearsay if introduced for the purpose of explaining the subsequent conduct of the person to whom the statement was made. Id.
In the present case, the statements of Bernice McDougald which Fairly related to the jury were offered not to prove the truth of any matter asserted therein, but rather to explain the subsequent conduct of the defendant and his accomplices in shooting Detective Harris and the context in which the murder occurred. The exact words used by McDougald thus were not important to the case; what was important was that McDougald made a statement and the remainder of the group responded. Reid, 335 N.C. at 661, 440 S.E.2d at 784. As the statements were offered not to prove the truth of the matter asserted, but rather for some other, proper purpose, they were not hearsay and were admissible. Id.; 2 Kenneth S. Broun, Brandts & Broun on North Carolina Evidence § 192 (4th ed. 1993).
Similarly, the statements related to the jury by Anna Hurd were offered not to prove the truth of the matter asserted, but rather merely to show that the statements were made. See State v. Faucette, 326 N.C. 676, 683, 392 S.E.2d 71, 74 (1990) (explaining that evidence is not hearsay if offered only to prove that a statement was made). Indeed, the statements related to the jury by Anna Hurd were directives to take action; they "asserted" no "matter" which could be subjected to any evaluation for truthfulness and could not have been hearsay. N.C.G.S. § 8C-1, Rule 801(c) (1992). Hurd merely testified that someone said to her that if they came upon a roadblock, she was "to stop and let them out," that she would then be "on [her] own" and that if anyone asked, she "hadn't seen them." These statements were introduced merely to show that they were made and to shed light on the circumstances surrounding the murder of Detective Harris and the conduct of the defendant and his accomplices immediately thereafter. See State v. Meekins, 326 N.C. 689, 695-96, 392 S.E.2d 346, 349 (1990) ("Any evidence offered to shed light upon the crime charged should be admitted by the trial court."). The statements therefore were properly admitted.
The trial court properly allowed the testimony of Scott Fairly and Anna Hurd complained of by the defendant. This assignment of error is without merit.
By his next assignment of error, the defendant insists that the trial court erred in denying his request for a special instruction on accomplice testimony. Without objection from the defendant, the trial court instructed the jury on accomplice testimony in accord with the appropriate pattern jury instruction on this issue. See N.C.P.I.Crim. 104.25 *12 (1986). At the conclusion of its charge to the jury, the trial court stated that it would "consider any requests or corrections to the charge or any other additional matters which anyone deems necessary for the court to submit a proper and accurate charge to the jury." The defendant requested the following special instruction on accomplice testimony:
The promise [to give truthful testimony] in the cooperation agreement between [Shannon] McKenzie and the State adds little to the truth-telling obligation imposed by the oath. The prosecutor often has no way of knowing whether the witness is telling the truth or not. The books are not filled with perjury indictments of government witnesses who have gone beyond the facts and an acquittal would not mean that as a matter of course the government would seek such an indictment or even fail to make its promised recommendation of leniency.
The trial court denied the defendant's request, reasoning that the pattern jury instruction already given was adequate and appropriate. We agree with the trial court.
The defendant seems to have taken the requested instruction at issue nearly verbatim from a concurring opinion in United States v. Arroyo-Angulo, 580 F.2d 1137, 1150 (2d Cir.), cert, denied, 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978) (Friendly, J., concurring). In his concurring opinion in that case, Judge Friendly was concerned with an Assistant United States Attorney's repeated references during closing argument to a witness' plea arrangement with the government. The majority had found no error in the prosecutor's remarks. While Judge Friendly agreed that the defendant was not entitled to a new trial, he expressed his concern with the prosecutor's repeated references to the witness' motivation for testifying truthfully. Judge Friendly deemed these remarks to be "prosecutorial overkill" and explained that had the defendant objected to the remarks, the trial court should have sustained the objection. Id. Judge Friendly felt that "if matters had gone too far to make a striking of the remarks an effective cure," the trial court should have instructed the jury in accord with the instruction requested by the defendant Morston in the present case. Id.
We see no need for such an instruction in the present case. The trial court instructed the jury on accomplice testimony as follows:
There is evidence which tends to show that the witness, Shannon McKenzie, was an accomplice in the commission of the crime as charged in this case. An accomplice is a person who joins with another in the commission of a crime. The accomplice may actually take part in acts necessary to accomplish the crime or he may knowingly help and encourage another in the crime either before or during its commission. An accomplice is considered by the law to have an interest in the outcome of the case. You should examine every part of the testimony of this witness with the greatest care and caution. If after doing so you believe his testimony in whole or in part, you should treat what you believe the same as any other believable evidence.
As previously noted, this instruction is identical in all material respects to the appropriate pattern jury instruction on accomplice testimony. See N.C.P.I.Crim. 104.25 (1986). Further, it was more than adequate to address the concerns associated with the credibility of accomplice testimony generally and the testimony of Shannon McKenzie in particular. No additional instruction on the issue was necessary. Cf. State v. Weddington, 329 N.C. 202, 210, 404 S.E.2d 671, 677 (1991) ("The trial court is not required to frame its instructions with any greater particularity than is necessary to enable the jury to understand and apply the law to the evidence bearing upon the elements of the crime charged."). The trial court thus did not err in refusing to give the defendant's requested special instruction. We overrule this assignment of error.
By another assignment of error, the defendant argues that he is entitled to a new trial on the charge of first-degree murder because the trial court erred in denying his request to submit a possible verdict of second-degree murder for consideration by the jury. We do not agree.
*13 First-degree murder "is the unlawful killing of another human being with malice and with premeditation and deliberation."State v. Bonney, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991); see also N.C.G.S. § 14-17 (1993). A killing is "premeditated" if "the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing." Bonney, 329 N.C. at 77, 405 S.E.2d at 154. A killing is "deliberate" if the defendant acted "in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." Id. Premeditation and deliberation "generally must be established by circumstantial evidence, because they ordinarily are not susceptible to proof by direct evidence." Id.
Where a defendant is charged with premeditated and deliberate first-degree murder, an instruction on the lesserincluded offense of second-degree murder need be given "only if the evidence, reasonably construed, tended to show lack of premeditation and deliberation or would permit a jury to rationally find defendant guilty of the lesser offense and acquit him of the greater." State v. Strickland, 307 N.C. 274, 287, 298 S.E.2d 645, 654 (1983), modified on other grounds by State v. Johnson, 317 N.C. 193, 344 S.E.2d 775 (1986); see also Hopper v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367, 373 (1982). As we have previously explained:
The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is no evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.
Strickland, 307 N.C. at 293, 298 S.E.2d at 658; see also State v. Eason, 328 N.C. 409, 430, 402 S.E.2d 809, 820 (1991).
The defendant insists that positive evidence was introduced in the present case directly tending to negate the elements of premeditation and deliberation. The defendant argues that the evidence tended to show, inter alia, that Bernice McDougald was the clear leader of the group which carried out the murder of Detective Harris, that the defendant had remained silent for the most part and that the defendant had "made few conscious decisions" on the night of the murder.
Other evidence tended to show, however, that the defendant willingly conspired to murder Detective Harris and carried this conspiracy through to its completion. Although the defendant did not speak when instructed by McDougald to "shoot the s___ out of [Detective Harris]," the defendant manifested his assent by his subsequent voluntary participation. The defendant also provided verbal confirmation of his intentions by stating that he was going to do what he had to do and that if he saw fear in the eyes of anyone, he would kill them. Once the group arrived at the Harris residence, the defendant, pursuant to the plan formulated at the Holiday Town Apartments, waited for Detective Harris to answer his door and then fired on Detective Harris at least four times. The defendant then fled and attempted to conceal his participation in the killing by washing himself and relinquishing his weapon to McDougald. On at least two occasions following the murder, the defendant boasted of his role as the perpetrator.
We conclude that this evidence was "sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation." Strickland, 307 N.C. at 293, 298 S.E.2d at 658. Even if it is assumed, as the defendant contends, that substantial evidence tended to show that Bernice McDougald was the "leader" of the group which carried out the murder of Detective Harris, and that the defendant "remained silent for the most part" and "made few conscious decisions" on the night of the murder, such evidence was insufficient to support a conviction for second-degree murder. The evidence that the defendant was *14 the person who actually killed Detective Harris and that he did so by driving to the Harris home and inflicting multiple gunshot wounds on Detective Harris after more than ample time and opportunity to consider and reject killing the victim was essentially uncontroverted. This evidence would only have justified submitting possible verdicts of guilty of first-degree murder or not guilty.Id.
The defendant also argues in support of this assignment that positive evidence at trial tending to show that he did not have the capacity to premeditate and deliberate required submission of a possible verdict of guilty of second-degree murder to the jury in this case. Specifically, various witnesses testified that the defendant had consumed "a considerable amount" of gin less than one hour before Detective Harris' murder, that the defendant had mixed crack cocaine and a pain reliever with his gin, that the defendant's eyes were "big and red" and that the defendant "looked like he was high." Although some evidence exists tending to show that the defendant had consumed alcohol and possibly illicit drugs on the night of the murder, it was insufficient to support an instruction by the trial court on voluntary intoxication raising an issue for the jury as to whether the defendant was so intoxicated by voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill. State v. Mash, 323 N.C. 339, 347-49, 372 S.E.2d 532, 537-38 (1988); cf. State v. Baldwin, 330 N.C. 446, 463, 412 S.E.2d 31, 41 (1992) (evidence that the defendant had consumed "about five or six" beers and an "indeterminate amount" of illicit drugs at some time prior to the murder was insufficient to show that he was so intoxicated as to be incapable of forming the intent necessary to commit premeditated and deliberate murder); State v. Strickland, 321 N.C. 31, 41-42, 361 S.E.2d 882, 888 (1987) (evidence that the defendant "had had two drinks" earlier on the evening of the murder was insufficient to show that he was so intoxicated at the time of the crime that he was incapable of forming the intent necessary to commit first-degree murder).
For the foregoing reasons, we conclude that none of the evidence pointed to by the defendant, nor any inference which could fairly be drawn therefrom, tended to show a homicide of a lower grade than first-degree murder. Thus, the evidence in the case at bar would not permit a jury to rationally find the defendant guilty of second-degree murder. Strickland, 307 N.C. at 287, 298 S.E.2d at 654. Accordingly, the trial court did not err in refusing to submit such a possible verdict to the jury. This assignment of error is without merit.
The defendant contends by his next assignment of error that he is entitled to a new trial because of several allegedly improper remarks made by the prosecutors during their closing arguments to the jury. We do not agree.
Trial counsel are allowed wide latitude in jury arguments. State v. Soyars, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). Counsel are permitted to argue the facts based on evidence which has been presented as well as reasonable inferences to be drawn therefrom. State v. Williams, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). Control of closing arguments is in the discretion of the trial court. State v. Zuniga, 320 N.C. 233, 253, 357 S.E.2d 898, 911, cert, denied, 484 U.S. 959, 108 S.Ct. 359, 98 L.Ed.2d 384 (1987).
Additionally, as this Court has previously pointed out, "for an inappropriate prosecutorial comment to justify a new trial, it `must be sufficiently grave that it is prejudicial error.'" Soyars, 332 N.C. at 60, 418 S.E.2d at 487-88 (quoting State v. Britt, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977)). In order to reach the level of "prejudicial error" in this regard, it now is well established that the prosecutor's comments must have "so infected the trial with' unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 [106 S.Ct. 2464, 2471], 91 L.Ed.2d 144, 157, reh'g denied, 478 U.S. 1036, 92 L.Ed.2d 774 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 [94 S.Ct. 1868], 40 L.Ed.2d 431 (1974)). *15 State v. Green 336 N.C. 142, 186, 443 S.E.2d 14, 40 (1994). In the present case, the defendant contends that several portions of the arguments of the prosecutors denied him due process and thereby amounted to prejudicial error. We address each of the defendant's contentions in support of this assignment individually.
During closing arguments, one prosecutor stated:
Don't get confused about non-issues. [Defense counsel] has talked about certain witnesses that the State didn't call. He has talked about that. That is not the evidence members of the jury. That's not evidence of what witnesses the State has or has not called. I am not suggesting to you that the defendant has any burden in this case but you can turn that issue around. If there was some Wendell McLaurin out there, if there was a Wendell McLaurin in the phone book, if there was a Wendell McLaurin in the City Directory in Southern Pines or Aberdeen or Moore County, don't you think that would have been brought to your attention by the defendant?
The defendant objected and moved for a mistrial. The trial court denied the defendant's motion for a mistrial but sustained his objection. The trial court then instructed the jury: "You will not consider the last part of the argument. The defendant has no pertinent duty of any kind to prove anything. Remember that; that's been told to you in the past."
The prosecutor then argued at considerable length concerning the evidence and testimony of witnesses introduced at trial. During the review of such evidence and witnesses, the prosecutor stated at one point, "Where is Wendell McLaurin, if such a person ever existed?" Counsel for the defendant moved to strike that statement. The trial court had the jury removed to the jury room. Counsel for the defendant then acknowledged that the statement of the prosecutor was "perhaps not objectionable in and of itself," but contended that in light of the previous argument of the prosecutor, it tended to shift the burden of producing evidence to the defendant. The trial court then stated: "We should refrain from any way implying that the defendant has any duty to bring Mr. McLaurin here. Both of you obviously have a right to talk about Mr. McLaurin. I think the way this last argument went it is not objectionable and I overrule the objection."
It is well established that a prosecutor may comment on a defendant's failure to produce witnesses or exculpatory evidence to contradict or refute evidence presented by the State. State v. Mason, 315 N.C. 724, 732, 340 S.E.2d 430, 436 (1986). Here, at worst, the prosecutor merely commented on the defendant's failure to produce a witness to refute the State's case. Such statements do not constitute impermissible comments. Id. Additionally, the prosecutor's statements were by way of reply to a comment by counsel for the defendant concerning the absence of the alleged witness in question. This argument is without merit.
The defendant next argues in support of this assignment that the prosecutor made an improper argument to the jury concerning the impact and effect of the crimes committed by the defendant on the victim's wife and son and the community. Specifically, the defendant contends that prejudicial error was committed when the prosecutor was permitted to argue as follows:
Ladies and gentlemen, Judy Harris and Anthony Harris are as much victims in this case as Ed Harris. You could see that and you could feel that in their testimony. You saw the stress that they were under, the pressure that they were under, the effort to maintain their composure and to keep from crying. They were fighting back tears.... What happened at Ed Harris' house ... was a great tragedy. Not only for Ed Harris. Not only for Judy and Anthony Harris. Not only for the Southern Pines Police Department but also for this community. If a person can't be safe in his own home, if his family can't be safe in their house, what have we come to? ... The bullets that tore through Ed Harris' body ... shattered the lives of several people. It killed Ed Harris. Judy Harris and Anthony Harris, their lives will never ever be the same again.... It was a bad *16 dream that Anthony Harris and Judy Harris will never wake up from.
Viewed in context, we do not believe that the arguments complained of here were improper. See, e.g., State v. Rogers, 323 N.C. 658, 661-64, 374 S.E.2d 852, 855-56 (1989); State v. Cummings, 323 N.C. 181, 190-93, 372 S.E.2d 541, 548-49 (1988), vacated and remanded on other grounds, 494 U.S. 1021, 110 S.Ct. 1464, 108 L.Ed.2d 602 (1990). Certainly they did not descend to the level of a denial of due process. This argument is without merit.
The defendant next argues in support of this assignment that the prosecutor misrepresented the evidence by stating that Shannon McKenzie, who had pled guilty to one count of second-degree murder and one count of conspiracy to commit murder, was facing a "life plus" sentence or a sentence of "life imprisonment plus 30 years." We conclude that this argument was fully supported by the evidence and was not improper. Therefore, the trial court did not err in denying the defendant's objection when the argument was made.
Finally, the defendant argues in support of this assignment of error that the trial court erred by permitting the prosecutor to argue as follows:
You all have an obligation and a duty in this case based upon all the evidence that you have heard ... to find the defendant guilty. The law enforcement officers have done their jobs. They have investigated this case. Scott Fairly, Shannon McKenzie, Patrice Hurd, Anna McLean [Hurd] have given testimony. They have done what they were required to do pursuant to a subpoena to come to court. Members of the jury ... we can have all the law we want on the books. It is against the law to commit murder.... When it gets right down to it, members of the jury, the buck stops with you. We can have those laws on the books. We can have witnesses to come in to testify. We can have investigators to investigate but until you are willing to convict people who have been proven guilty beyond a reasonable doubt, the law is nothing but words on paper. the defendant contends that this was an improper argument by the prosecutor to the effect that the jurors were accountable to the police, the witnesses, the community and society in general. He argues that this caused the jury to base its verdict on its perceived accountability to those groups rather than on the evidence presented at trial. We do not agree with this reading of the prosecutor's argument. Instead, we perceive the argument as a proper argument contending that the jurors had an obligation to convict based upon the evidence which had been introduced at trial and which had been discovered due to the proper performance of law enforcement officers and witnesses. This argument is without merit.
For the foregoing reasons, we have rejected the defendant's arguments in support of this assignment. This assignment of error is without merit and is overruled.
By another assignment of error, the defendant maintains that he is entitled to a new trial with regard to his conviction for assault with a deadly weapon because the trial court's instructions on the doctrine of transferred intent were unconstitutional. Specifically, the defendant contends that the trial court's instructions established a conclusive presumption that relieved the State of its burden of proof. The defendant acknowledges, however, that we have previously rejected this contention. See State v. McHone, 334 N.C. 627, 644, 435 S.E.2d 296, 306 (1993), cert, denied, ___ U.S. ___, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994); State v. Locklear, 331 N.C. 239, 244-46, 415 S.E.2d 726, 729-30 (1992). Having considered the defendant's argument with regard to this issue, we find no compelling reason to depart from our prior holdings which the defendant correctly recognizes as dispositive. This assignment of error is without merit.
By his next assignment of error, the defendant argues that he is entitled to resentencing on his conviction for conspiracy to commit murder because the trial court improperly employed the same evidence to prove more than one aggravating factor under the Fair Sentencing Act. Among the factors the trial court found in aggravation of the defendant's conspiracy conviction were *17 that [t]he offense was committed to disrupt the lawful exercise of a governmental function or the enforcement of laws" and that "[t]he offense was committed to hinder the lawful exercise of a governmental function or the enforcement of laws." See N.C.G.S. § 15A-1340.4(a)(1)(d) (1988 & Supp.1993). The defendant argues that the trial court erroneously relied upon the same evidence in finding both of these aggravating factors. We agree.
Under the Fair Sentencing Act, "the same item of evidence may not be used to prove more than one factor in aggravation." N.C.G.S. 15A-1340.4(a)(1). We have recognized and applied this principle on a number of occasions. See, e.g., State v. Kyle, 333 N.C. 687, 705, 430 S.E.2d 412, 422 (1993); State v. Erlewine, 328 N.C. 626, 638, 403 S.E.2d 280, 287 (1991); State v. Davis, 325 N.C. 607, 633, 386 S.E.2d 418, 432 (1989), cert, denied, 496 U.S. 905,110 S.Ct. 2587,110 L.Ed.2d 268 (1990); State v. Brown, 312 N.C. 237, 250, 321 S.E.2d 856, 863-64 (1984).
In the present case, the trial court used the same item of evidencethat the defendant had conspired with Bernice McDougald and others to murder a law enforcement officer who was interfering with their drug tradeas the basis for finding both aggravating factors. This is contrary to the statutory mandate and therefore constitutes error.
The State contends, however, that the trial court in fact did not find both of these aggravating factors. The State notes that while the sentencing form indicates that the trial court found both factors, the transcript contains the following statement of the trial court to the contrary:
In case No. 91-CRS-1442 wherein the jury has unanimously returned a verdict of guilty of conspiracy to commit murder ... [t]he court will find as aggravating factors, aggravating factor [No.] 4b, that the offense was committed to hinder the lawful exercise of a governmental function or the enforcement of the law, No. 5, [that] the offense was committed against a present or former law enforcement officer and No. 15, that the defendant had prior convictions for criminal offenses punishable by more than 60 days confinement.
(Emphasis added), Based on this portion of the transcript, the State insists that the trial court did not find the aggravating factor that the offense was committed to disrupt the lawful exercise of a governmental function or the enforcement of laws. The State therefore argues that the indication on the sentencing form that this aggravating factor had been found by the trial court was merely a clerical error.
While the State may indeed be correct, we believe that the better course is to err on the side of caution and resolve in the defendant's favor the discrepancy between the trial court's statement in open court, as revealed by the transcript, and the sentencing form. Cf. State v. Pakulski, 319 N.C. 562, 574, 356 S.E.2d 319, 326 (1987) ("Where the trial judge has submitted the case to the jury on alternative theories, one of which is determined to be erroneous and the other properly submitted, and we cannot discern from the record the theory upon which the jury relied,... we resolve the ambiguity in favor of the defendant."); State v. Lawing, 12 N.C.App. 21, 23, 182 S.E.2d 10, 11-12 (1971) (where the trial court stated in open court that the defendant would be sentenced to six years imprisonment, but the signed judgment indicated a sentence of eight years imprisonment, the court of appeals remanded for imposition of the six-year sentence). We therefore conclude that the trial court improperly found two factors in aggravation on the basis of the same item of evidence. Thus, while the verdict returned against the defendant for conspiracy to commit murder shall remain undisturbed, the sentence for this offense must be vacated and this case is remanded to the Superior Court, Hoke County, for resentencing in accordance with the provisions of Articles 81 and 81A of Chapter 15A of the North Carolina General Statutes. See State v. Aheam, 307 N.C. 584, 602, 300 S.E.2d 689, 701 (1983) ("in every case in which it is found that the judge erred in a finding or findings in aggravation and imposed a sentence beyond the presumptive term, the case must be remanded for a new sentencing hearing").
By his final assignment of error, the defendant argues that he is entitled to resentencing *18 on his convictions for assault with a deadly weapon with intent to kill inflicting serious injury and for discharging a firearm into occupied property because the trial court improperly aggravated these offenses under the Fair Sentencing Act with evidence the State had previously used to prove an element of each of these offenses. See N.C.G.S. § 15A-1340.4(a)(1). The State concedes that the defendant is entitled to resentencing on these two convictions for this reason. Therefore, while the verdicts returned against the defendant for assault with a deadly weapon with intent to kill inflicting serious injury and for discharging a firearm into occupied property shall remain undisturbed, the sentence for each of these offenses is vacated and these cases are remanded to the Superior Court, Hoke County, for resentencing in accordance with the provisions of Articles 81 and 81A of Chapter 15A of the North Carolina General Statutes. See Ahearn, 307 N.C. at 602, 300 S.E.2d at 701.
In summary, we hold that the defendant's conviction of first-degree murder and the sentence of life imprisonment entered thereon were without error. As to each of the other charges against the defendant, we find no error in the guilt-determination phase and leave the verdicts finding the defendant guilty of those crimes undisturbed. However, for reasons previously stated in this opinion, the sentences entered upon those convictions must be vacated and this case remanded to the Superior Court, Hoke County, to the end that the defendant be resentenced for each of those crimes.
NO. 91CRS1442, COUNT #1, FIRSDEGREE MURDER: NO ERROR.
NO. 91CRS1442, COUNT # 2, CONSPIACY TO COMMIT MURDER: GUILT PHASE, NO ERROR; SENTENCE VCATED AND CASE REMANDED FOR RESENTENCING IN ACCORDANCE WITH THE PROVISIONS OF ARTICLES 81 AND 81A OF CHAPTER 15A OF THE NORTH CAROLINA GENERAL STAUTES.
NO. 91CRS3253, COUNT # 1, ASSAULT WITH A DEADLY WEAPON WITH ITENT TO KILL INFLICTING SERIOUS INJURY: GUILT PHASE, NO ERROR; SENTENCE VACATED AND CASE RMANDED FOR RESENTENCING IN ACORDANCE WITH THE PROVISIONS OF ARTICLES 81 AND 81A OF CHATER 15A OF THE NORTH CAROLINA GENERAL STATUTES.
NO. 91CRS3253, COUNT #2, DICHARGING A FIREARM INTO OCCPIED PROPERTY: GUILT PHASE, NO ERROR; SENTENCE VACATED AND CASE REMANDED FOR RESENTENING IN ACCORDANCE WITH THE PRVISIONS OF ARTICLES 81 AND 81A OF CHAPTER 15A OF THE NORTH CAOLINA GENERAL STATUTES.