NO. COA14-426

NORTH CAROLINA COURT OF APPEALS

Filed: 21 October 2014

STATE OF NORTH CAROLINA

v.                                      Wake County
                                        No. 11 CRS 219920

THOMAS EVERETTE, JR.,
      Defendant


Appeal by Defendant from judgment entered 19 October 2013 by Judge Orlando F. Hudson in Wake County Superior Court. Heard in the Court of Appeals 8 September 2014.

> *Roy Cooper, Attorney General, by Harriet F. Worley, Special Deputy Attorney General, for the State.*

> *Staples Hughes, Appellate Defender, by Jillian C. Katz, Assistant Appellate Defender, for defendant-appellant.*


BELL, Judge.

Thomas Everette, Jr. ("Defendant") appeals from his conviction for obtaining property by false pretenses. On appeal, Defendant contends that the trial court erred by (1) denying his motion to dismiss because there was a fatal variance between the false pretense alleged in the indictment and the State's evidence at trial; (2) denying his motion to dismiss because there was no causal relationship between the false

representation alleged and the value obtained; and (3) miscalculating Defendant's prior record points. After careful review, we conclude that Defendant received a fair trial free from prejudicial error, but remand for correction of a clerical error on Defendant's prior record level worksheet.

## Factual Background

The State presented evidence tending to show the following facts: In 2010, a home located at 2401 Victoria Park Lane in Raleigh, North Carolina was vacant after a foreclosure. Veneta Ford ("Ms. Ford"), a realtor in Raleigh, was contacted by Bank of America, the new owner of the property, to prepare the home for re-sale. Ms. Ford put the utilities in her name and had the house re-keyed. She placed the house on the market on 12 July 2010.

Ms. Ford visited the house several times to clean and perform maintenance on the property. On one visit, she discovered that the for-sale sign she had placed on the property had been removed. Additionally, the house had been re-keyed so that her key did not work. On another occasion, Ms. Ford went to the property and discovered that the lockbox attached to the front door containing the keys to the house had been cut off. In January 2011, Ms. Ford noticed a professional-looking sign warning against trespassing on the property. Neighbors informed

Ms. Ford that someone had moved into the home. She also discovered that someone had taken the utilities out of her name and put them in his own name. Ms. Ford contacted the Raleigh Police Department about this incident.

On 23 August 2011, Raleigh Police Department Sergeant Timothy Halterman ("Sergeant Halterman") responded to a call for service at 2401 Victoria Park Lane after receiving a complaint from Ms. Ford that an unauthorized person was living on the property. Sergeant Halterman asked Defendant for documentation showing he was authorized to live in the home. Defendant retrieved a lease agreement from his safety deposit box and presented it to Sergeant Halterman. He informed Sergeant Halterman that the lease was from a company in Greenville, North Carolina and that he had been living in the house for months. After this encounter, Sergeant Halterman contacted his superior officer at the time, who advised him to contact Detective Terry Embler ("Detective Embler"), a Raleigh Police Department financial crimes investigator, to request that he further investigate the true ownership of 2401 Victoria Park Lane.

Ms. Ford eventually spoke with Defendant after leaving her card on the door of the house with a note requesting that someone call her. Defendant contacted her to tell her that he had bought the property and had a deed. Ms. Ford checked the

Wake County public records and found that a general warranty deed had been recorded transferring title to the property from International Fidelity Trust ("IFT") to itself, with Defendant listed as the trustee.

During this time, Detective Embler was investigating whether Defendant was validly living at the Victoria Park Lane property. He discovered that on 13 July 2011, a special warranty deed had been recorded at the Wake County Register of Deeds Office transferring title to the property at 2401 Victoria Park Lane from Bank of New York Mellon to IFT. This deed was signed by Keith Chapman as attorney-in-fact for the bank and had been notarized by Carolyn Evans ("Ms. Evans").

Detective Embler testified that he was not able to find any information about IFT on the North Carolina Secretary of State's website, at the South Carolina Secretary of State's office, or through an Internet search. He discovered that the address given for the business corresponded to a P.O. Box at a UPS store in Greenville, North Carolina. Detective Embler learned that P.O. Box 250, the address listed as IFT's address on the general warranty deed, actually belonged to Defendant, and that Defendant had recorded a vast number of deeds and other paperwork with the Edgecombe County Register of Deeds Office using P.O. Box 250 as his address. In particular, Detective

Embler testified that Defendant had recorded a special warranty deed with the Edgecombe County Register of Deeds Office that looked remarkably similar to the special warranty deed for the property at 2401 Victoria Park Lane that had been recorded in Wake County.

After collecting this information, Detective Embler contacted Secret Service Agent Michael Southern ("Special Agent Southern") to assist in the investigation. On 24 August 2011, Detective Embler and Special Agent Southern went to the Victoria Park Lane property with an arrest warrant for Defendant. Defendant was arrested and charged with breaking and entering and obtaining property by false pretenses. The next day Defendant was also charged with forgery of deeds.

On 28 November 2011 a grand jury indicted Defendant for breaking and entering, obtaining property by false pretenses, and forgery of a deed. A jury trial commenced on 14 October 2013 in Wake County Superior Court.

At trial, Defendant testified on his own behalf and presented the following account of the events leading up to his arrest: Defendant was facing potential foreclosure on his house which was under construction in Edgecombe County. In an effort to prevent his house from being foreclosed on, Defendant contacted a company he found on Craigslist called International

Fidelity Trust and spoke with someone named John Kenny about using IFT's services to improve his credit score.

Defendant also testified that IFT told him that it owned several properties in Wake County at which he could live in exchange for performing work on the property. According to Defendant, he chose to live at 2401 Victoria Park Lane, a property purportedly owned by IFT. In December 2010, at IFT's direction, Defendant recorded several documents, including a common law lien and a general warranty deed, related to the Victoria Park Lane property as "trustee" for IFT. However, Defendant testified that he did not remember recording the general warranty deed specifically, because it was allegedly part of a package that contained the common law lien and other documents.

According to Defendant, on 15 December 2010, IFT had the property rekeyed and he began performing maintenance on the property. In May 2011, Defendant entered into a lease agreement with IFT for the Victoria Park Lane property set to begin on 31 May 2011. Defendant and his family moved into the house on 10 June 2011. Around that time, he also applied for utility services in his name at 2401 Victoria Park Lane. Defendant testified that he was paying taxes on the property by making payments to IFT in monthly installments.

At trial, the State introduced a copy of the special warranty deed recorded with the Wake County Register of Deeds Office. Detective Embler testified that he discovered another deed similar to this special warranty deed through which Defendant and his wife had received title to a home in Edgecombe County in 2006. Both deeds contained the same formatting, were signed by the same individual as attorney-in-fact for the lender that had foreclosed on each of the properties despite the fact that the lenders transferring title on the two deeds were different, and the same out-of-state law firm was purported to have prepared both deeds. Defendant denied having recorded the special warranty deed with the Wake County Register of Deeds Office.

Ms. Evans, the notary public who had purportedly notarized the special warranty deed for 2401 Victoria Park Lane, testified at trial that she was a licensed notary in South Carolina, not North Carolina. She testified that she did not notarize the special warranty deed and that the signature on the document was not hers. She further stated that the notary stamp on the special warranty deed was the stamp she used when she worked at Wells Fargo, but that she was not working for Wells Fargo or any other lender at the time this deed was notarized. She also observed that the special warranty deed was not properly

notarized because the signature was not hand-dated, and a notary is required to hand-date her signature.

Dawn Hurley ("Ms. Hurley"), a Bank of America banking officer, testified that Bank of America acquired the home at 2401 Victoria Park Lane in February 2010 through a foreclosure sale. Ms. Hurley also testified that the title to the property was legally in the name of Bank of America, not Bank of New York Mellon, as indicated on the special warranty deed.

Veronica Gearon ("Ms. Gearon"), Wake County Register of Deeds recording supervisor, testified that by virtue of the recording of the special warranty deed, ownership of the property was transferred from Bank of New York Mellon to IFT. Ms. Gearon stated that she was unsure whether the recording of the earlier warranty deed in December 2010 that Defendant admitted he had prepared and signed as trustee for IFT would have transferred ownership of the property because the grantor and grantee were listed as the same entity — IFT — on that deed.

On 19 October 2013, the jury returned a verdict finding Defendant guilty of obtaining property by false pretenses, but deadlocked with respect to the breaking and entering and forgery of deeds charges. As a result, the trial court declared a mistrial with respect to these two charges. That same day, the

trial court sentenced Defendant to a term of 110 to 141 months imprisonment. Defendant gave notice of appeal in open court.

## Analysis

### I. Fatal Variance

Defendant first argues that the trial court erred by denying his motion to dismiss the charge of obtaining property by false pretenses because there was a fatal variance between the indictment and the State's evidence. Specifically, Defendant contends that the indictment alleged that he had "filed a forged and false Special Warranty Deed," but that the State did not present sufficient evidence at trial to establish that he forged or was involved in forging the special warranty deed. We find Defendant's contentions to be without merit.

To preserve a fatal variance argument for appellate review, a defendant must state at trial that an allegedly fatal variance is the basis for his motion to dismiss. *State v. Curry*, 203 N.C. App. 375, 384, 692 S.E.2d 129, 137, *appeal dismissed and disc. review denied*, 364 N.C. 437, 702 S.E.2d 496 (2010). At trial, Defendant based his motion to dismiss solely on the grounds of insufficient evidence. Therefore, Defendant did not properly preserve for appellate review his argument that there was a fatal variance between the indictment and the evidence presented for appellate review. *See State v. Pickens*, 346 N.C.

628, 645, 488 S.E.2d 162, 172 (1997) ("Regarding the alleged variance between the indictment and the evidence at trial, defendant based his motions at trial solely on the ground of insufficient evidence and thus has failed to preserve this argument for appellate review.") (citation omitted). However, Defendant asks this Court to review his argument in our discretion pursuant to Rule 2 of the Rules of Appellate Procedure. *See* N.C.R. App. P. 2. We elect to do so and conclude that Defendant has not shown a variance between the indictment and the evidence presented.

"In order for a variance to warrant reversal, the variance must be material. A variance is not material, and is therefore not fatal, if it does not involve an essential element of the crime charged." *State v. Norman*, 149 N.C. App. 588, 594, 562 S.E.2d 453, 457 (2002) (citations omitted). The elements of obtaining property by false pretenses are

> (1) [a] false representation of a past or subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which the defendant obtains or attempts to obtain anything of value from another person.

*State v. Saunders*, 126 N.C. App. 524, 528, 485 S.E.2d 853, 856 (1997) (citation omitted); *see* N.C. Gen. Stat. § 14-100(a) (2013).

Here, Defendant contends that the State's evidence at trial was insufficient to establish that he forged the special warranty deed or took part in preparing this document. However, the indictment states, in pertinent part, as follows:

> 2. And the jurors for the State upon their oath present that on or about July 13, 2011, in Wake County, the Defendant named above unlawfully, willfully, and feloniously did knowingly and designedly with the intent to cheat and defraud obtain and attempt to obtain the house and real property located at 2401 Victoria Park Lane, Raleigh, North Carolina from Bank of New York Mellon Corporation . . . by means of a false pretense which was calculated to deceive and did deceive.
>
> The false pretense consisted of the following: the Defendant *presented and filed* a forged and false Special Warranty Deed in the Wake County Register of Deeds office purporting to transfer ownership of this foreclosed property from the mortgage holding bank to an apparent false trust in which the Defendant is the trustee.

(Emphasis added).

The indictment does not allege that the false pretense at issue is that Defendant forged the special warranty deed, nor is forgery an essential element of the offense of obtaining property by false pretenses. Defendant has shown no fatal variance between the indictment and the evidence presented. At trial, the State presented ample evidence that Defendant presented and recorded a forged deed — the precise

representation that was charged.  As such, Defendant's argument on this issue is without merit.

## II.  Causal Relationship Between False Representation Alleged and the Value Obtained

Defendant next contends that the trial court erred by denying his motion to dismiss the charge of obtaining property by false pretenses for insufficient evidence because the State failed to show that the alleged false pretense — the forgery of the special warranty deed — caused Defendant to obtain the house at 2401 Victoria Park Lane.

Defendant acknowledges that his trial counsel failed to specifically preserve this argument at trial.  However, Defendant again asks this Court to invoke Rule 2 to reach the merits of his argument.  Under Rule 2, this Court may suspend the rules of appellate procedure in order "[t]o prevent manifest injustice to a party, or to expedite decision in the public interest."  N.C.R. App. P. 2 (2013).

"Rule 2 relates to the residual power of our appellate courts to consider, in exceptional circumstances, significant issues of importance in the public interest or to prevent injustice which appears manifest to the Court and only in such instances."  *State v. Hart*, 361 N.C. 309, 315-16, 644 S.E.2d 201, 205 (2007) (citations and quotation marks omitted).  "[T]he exercise of Rule 2 was intended to be limited to occasions in

which a fundamental purpose of the appellate rules is at stake, which will necessarily be rare occasions." *Id.* at 316, 644 S.E.2d at 205 (citations and internal quotation marks omitted).

Nothing in the record or briefs demonstrates "exceptional circumstances" sufficient to justify suspending or varying the rules in order to prevent "manifest injustice" to Defendant. *Id.* at 315, 644 S.E.2d at 205. The State presented evidence at trial that the special warranty deed was a forgery and that Defendant was the one who filed the forged deed. The natural consequence of filing the forged deed was that Defendant secured possession of the house, thereby implying causation. *State v. Dale*, 218 N.C. 625, 641, 12 S.E.2d 556, 565 (1945) ("The facts alleged in the indictment here, relating to the misrepresentation . . . are such as to imply causation, since they are obviously calculated to produce the result."). In the exercise of our discretionary authority, we decline to invoke Rule 2. Therefore, this argument is dismissed.

III. Miscalculation of Defendant's Prior Record Level Points

Defendant's final argument on appeal is that the trial court incorrectly calculated his prior record level points. Defendant acknowledges that a recalculation of his prior record points will not alter his sentence, but asks that a new prior record level worksheet be completed to accurately reflect his

record. We agree.

Defendant contends that he should only have 10 prior record level points, rather than 11, because two of the misdemeanors listed on the worksheet and used in calculating Defendant's prior record level had the same date of conviction. As such, only one may be counted for purposes of determining prior record points. N.C. Gen. Stat. §15A-1340.14(d) (2013).

Because the sentence imposed will not be affected by a recalculation of Defendant's prior record points, it is not necessary that there be a new sentencing hearing. Rather, we treat this as a clerical error and remand this matter to the trial court for its correction. *State v. Dobbs*, 208 N.C. App. 272, 274, 702 S.E.2d 349, 350-51 (2010) (finding judgment erroneously designating defendant's offense as Class G felony rather than Class H felony to be clerical error and remanding to trial court for correction where sentence unaffected by error).

The dissent relies on *State v. Jarman* for the proposition that while a trial court may "amend its records to correct clerical mistakes or supply defects or omissions therein", it lacks the authority, "under the guise of an amendment of its records, to correct a judicial error." 140 N.C. App. 198, 202, 535 S.E.2d 875, 878 (2000) (quoting *State v. Davis*, 123 N.C. App. 240, 242-43, 472 S.E.2d 392, 393 (1996). We note, however,

that *Jarman* and *Davis* can be distinguished from the present case. In both *Jarman* and *Davis*, the distinction between clerical and judicial errors was of importance because it was the *trial court* that, upon its own initiative (through a hearing or motion), sought to correct an error.

In *Davis*, we held that the trial court "impermissibly corrected a judicial error," and thus "was without jurisdiction to amend the judgments in the course of settling the record on appeal" where the trial court entered an amended judgment after conducting a hearing to settle the record on appeal. 123 N.C. App. 240 at 242-43, 472 S.E.2d 392 at 393-94. On the other hand, in *Jarman*, we held that the trial court's correction of an order resulting from inaccurate information inadvertently provided by the deputy clerk was a clerical error, and therefore proper, because "the trial judge did not exercise any judicial discretion or undertake any judicial reasoning" when signing an order providing credit against service of sentence that the deputy clerk prepared. 140 N.C. App. at 203, 535 S.E.2d at 879.

In the case at bar, the trial court's error was brought to this Court by Defendant on appeal. "Where there has been uncertainty in whether an error was 'clerical,' the appellate courts have opted to err on the side of caution and resolve the discrepancy in the defendant's favor." *Jarman* at 203, 535

S.E.2d at 879 (citation and internal quotation marks omitted). In *Jarman*, we stated that "the judge's action in signing the order giving defendant credit to which he believed she was legally entitled was a mechanical and routine, though mistaken, application of a statutory mandate." *Id*. Here, the assistant district attorney prepared Defendant's prior record level worksheet for the trial judge's signature by filling in the blanks on a standard AOC form and presenting it to the trial judge. As in *Jarman*, the record in the case *sub judice* "demonstrates that the trial judge did not exercise any judicial discretion or undertake any judicial reasoning when signing" the prior record level worksheet. *Id*.

Further, because the trial court did not attempt to correct its own error while the case was on appeal, whether the trial court *would* have had jurisdiction to amend Defendant's prior record level points is inapposite. Therefore, we find it proper to treat Defendant's miscalculation of prior record level points as a clerical error and remand to the trial court for correction. *State v. Smith*, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696 (2008) ("When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth.")

(citation and internal quotation marks omitted).

## Conclusion

For the reasons stated above, we conclude that Defendant received a fair trial free from error, but remand for correction of the clerical error found in his prior record level worksheet.

NO ERROR; REMANDED FOR CORRECTION OF CLERICAL ERROR.

Judge McCULLOUGH concurs.

Judge ERVIN concurs in part and dissents in part.

NO. COA14-426

NORTH CAROLINA COURT OF APPEALS

Filed: 21 October 2014

STATE OF NORTH CAROLINA

v.

Wake County
No. 11 CRS 219920

THOMAS EVERETTE, JR.

ERVIN, Judge, concurring in part and dissenting in part.

Although I concur in my colleagues' conclusion that Defendant received a fair trial that was free from prejudicial error and that his convictions should remain undisturbed, I am unable to agree with the Court's determination that the trial court's apparent miscalculation of Defendant's prior record level points for sentencing purposes constitutes a clerical error that should be corrected on remand. On the contrary, I believe that this miscalculation constitutes judicial error and conclude, given the fact that this error had no impact on the calculation of Defendant's prior record level, that there is no need for us to remand this case to the trial court for the correction of Defendant's prior record worksheet. As a result, I concur in the Court's opinion in part and dissent from the Court's opinion in part.

According to N.C. Gen. Stat. § 15A-1340.14(a), a defendant's prior record level is determined "by calculating the

sum of the points assigned to each of the offender's prior convictions that the court . . . finds to have been proved in accordance with this section." In addition, N.C. Gen. Stat. § 15A-1340.14(d) provides that:

> For purposes of determining the prior record level, if an offender is convicted of more than one offense in a single superior court during one calendar week, only the conviction for the offense with the highest point total is used. If an offender is convicted of more than one offense in a single session of district court, only one of the convictions is used.

In the present case, the trial court calculated Defendant's prior record level by assigning a single point each for six of Defendant's seven prior eligible misdemeanor convictions, two of which occurred in the Edgecombe County District Court on 10 February 2005 and one of which stemmed from a charge that appears to have been voluntarily dismissed after the defendant noted an appeal to the Edgecombe County Superior Court. As a result of the fact that two of Defendant's seven eligible misdemeanor convictions appear to have occurred during a single session of court and the fact that one of Defendant's seven eligible misdemeanor convictions appears to have been overturned on appeal to the Superior Court, I agree with Defendant's contention, which my colleagues have accepted, that the trial court erred by calculating Defendant's prior record level using

six, rather than five, misdemeanor convictions. However, as Defendant has candidly acknowledged, the erroneous inclusion of an additional prior record point based upon Defendant's convictions for committing misdemeanor offenses had no impact upon the calculation of Defendant's prior record level given that Defendant would still have been subject to being sentenced as a Level IV offender even after the removal of the erroneously assigned prior record point.

Although my colleagues acknowledge that the trial court's apparent error had no effect upon the calculation of Defendant's prior record level, they have concluded that the trial court should be required to correct Defendant's prior record level worksheet to eliminate any trace of this error from the court records on the basis of our authority to order the correction of clerical errors. According to well-established North Carolina law, "a court of record has the inherent power to make its records speak the truth and, to that end, to amend its records to correct clerical mistakes or supply defects or omissions therein," *State v. Jarman*, 140 N.C. App. 198, 202, 535 S.E.2d 875, 878 (2000) (citation omitted), with a "clerical error" being defined as "[a]n error resulting from a minor mistake or inadvertence, esp. in writing or copying something on the record, and not from judicial reasoning or determination." *Id.*

(quoting Black's Law Dictionary 563 (7th ed. 1999)). However, a trial court lacks the authority, "under the guise of an amendment of its records, [to] correct a judicial error." *Id.* (citation omitted).[1]

In *State v. Smith*, 188 N.C. App. 842, 844-45, 656 S.E.2d 695, 696 (2008), this Court found that a clerical error had occurred in an instance in which, after correctly identifying the aggravating factors to be utilized for the purpose of sentencing Defendant, the trial court misread the form used for the purpose of determining the aggravating and mitigating factors utilized in sentencing convicted impaired drivers and checked the wrong box on that form. In the present case, by contrast, the record contains no indication that the trial court did anything other than make a legally erroneous decision

---

[1] As my colleagues correctly note, the decision in *Jarman* refers to the power of the trial court, rather than an appellate court, to correct clerical errors. The distinction upon which my colleagues rely strikes me as of little importance given that the decisions remanding cases to the trial courts for the correction of clerical errors do not appear to assert a separate, and superior, authority possessed by appellate courts to require the correction of clerical errors. Instead, those decisions appear to me to reflect instructions delivered by the appellate courts to the trial courts to exercise their authority to correct clerical errors in particular circumstances. As a result, the fact that the error correction authority referenced in *Jarman* and similar cases is possessed by the trial courts does not mean that appellate courts have the authority to order the trial courts to correct errors that trial courts lack the authority to correct on their own.

concerning the number of prior record points that Defendant had accumulated. In other words, instead of making an inadvertent clerical error, the trial court made an erroneous judicial determination concerning the number of prior record points that Defendant had accumulated for felony sentencing purposes.[2] As a result, given that no clerical error, as compared to an erroneous judicial determination, appears to have been made and given Defendant's concession, which is clearly correct, that rectification of the trial court's error in calculating the

---

[2] The Court appears to suggest that the miscalculation of Defendant's prior record level constituted a clerical, rather than a judicial, error by asserting that "the assistant district attorney prepared Defendant's prior record level worksheet for the trial court's signature by filling in the blanks on a standard AOC form and presenting it to the trial judge" and arguing that, "[a]s in *Jarman*, the record in the case *sub judice* 'demonstrates that the trial judge did not exercise any judicial discretion or undertake any judicial reasoning when signing' the prior record level worksheet." I am unable to accept the notion that the trial court is engaged in the merely ministerial act of signing off on a prior record level determination made by the prosecutor during the sentencing process given the clear command of N.C. Gen. Stat. § 15A-1340.14 that the trial court, rather than the prosecutor, be responsible for correctly calculating a convicted criminal defendant's prior record level and the numerous decisions of the Supreme Court and this Court evaluating the extent to which particular trial judges carried out that responsibility in accordance with the applicable law. As a result, the determination at issue here is a far cry from the relatively ministerial calculation of the amount of credit for time served in pretrial confinement at issue in *Jarman*. *State v. Mason*, 295 N.C. 584, 594, 248 S.E.2d 241, 248 (1978), *cert. denied*, 440 U.S. 984, 99 S. Ct. 1797, 60 L. Ed. 2d 246 (1979) (describing the determination of the amount of credit for pretrial confinement to which a convicted criminal defendant is entitled as "a matter for administrative action").

number of prior record points that Defendant had accumulated for felony sentencing purposes would not result in a reduction in Defendant's sentence,[3] I am unable to agree with my colleagues' determination that this case should be remanded to the trial court for the correction of Defendant's prior record level worksheet and respectfully dissent from my colleagues' determination to the contrary.[4]  I do, however, concur in the remainder of the Court's opinion.

---

[3]Although my colleagues correctly note our prior statement in *Jarman* to the effect that, "[w]here there has been uncertainty in whether an error was 'clerical,' the appellate courts have opted 'to err on the side of caution and resolve [the discrepancy] in the defendant's favor,'" *Jarman*, 140 N.C. App. at 203, 535 S.E.2d at 879 (alteration in original) (quoting *State v. Morston*, 336 N.C. 381, 410, 445 S.E.2d 1, 17 (1994)), they overlook the context in which that statement was made. Aside from the fact that the error at issue here is clearly judicial rather than clerical in nature, the manner in which the court resolved the matter at issue in the decision from which the *Jarman* court derived the language on which my colleagues rely, which was whether the trial court found the existence of one or multiple aggravating factors for sentencing purposes, was critical to a determination of whether or not the defendant had to be resentenced.  As a result, since the manner in which the present dispute is resolved will have no practical impact on Defendant, I question whether the principle upon which my colleagues rely has any relevance in the present case.

[4]I concede that the decision that the Court has reached in this case will have little immediate practical impact, when considered in the narrow context in which it has been made. However, the effect of substantially broadening the extent to which litigants are able to obtain appellate decisions requiring the correction of non-clerical errors on remand will, over time, add to the burdens that are already faced by our trial courts and trial court staffs without adding anything of substance to

the quality of justice provided in the General Court of Justice.